## Kentucky Utilities Company v. Searcy.

(Decided January 19, 1916.)

### Appeal from Anderson Circuit Court.

1. Electricity—Care Required in Handling.—Those who manufacture and use electricity must exercise the utmost care to protect others

from danger therefrom. They are not insurers, for the manufacture and sale of electricity is lawful; but in handling so dangerous an agency, care proportionate to the danger must be observed, and to this end nothing short of the utmost care is sufficient; and where, as in this case, it is made to conclusively appear from the evidence that electric wires used for lighting purposes and carrying a current of eleven thousand volts of electricity, cannot be insulated, the only care required of the company operating them was to place and maintain them at such a height from the ground as that persons, in no way charged with the duty of keeping them in repair, or entitled to go on business or pleasure, could not reasonably be expected to come in contact with them, and such care was exercised in securely maintaining such wires, along a public highway, at a height of thirty-five feet from the ground.

2.   Negligence—Personal Injury From Contact with Electric Wire.— Negligence of Person not in Employ of Owner of Instrumentality through which Injury Received.—An employe of a telephone company, engaged in holding a telephone wire while another employe thereof was attaching it to the pole of an electric lighting company, 8½ feet below the uninsulated wires of such electric lighting company, maintained at a height of 35 feet above the ground, cannot recover of the latter damages for a personal injury sustained by him, which resulted from the negligent act of his fellow employe in using such unnecessary force to disentangle it from the cross-arm of a contiguous telephone pole, as to cause it to be thrown so high as to come in contact with the electric lighting company's uninsulated electric wires above; and on proof of these facts a peremptory instruction should have been given by the trial court, directing a verdict for the electric lighting company.

FRED FORCHT, L. R. CURTIS and LILLARD CARTER for appellant.

EDWARDS, OGDEN & PEAK and F. R. FELAND for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Reversing.

The appellee, William Searcy, brought this action against the Independent Long Distance Telephone & Telegraph Company, the Lawrenceburg Exchange of the Home Telephone Company, the Home Telephone Company and the appellant, Kentucky Utilities Company, seeking the recovery against them jointly and severally of damages for injuries to his person caused, as alleged, by the negligence of the defendants and each of them. The defendants filed a joint and separate answer containing a traverse, pleas of contributory negligence and assumption of risk on the part of appellee, and that his injuries, if any were sustained by him, were caused by the

negligence of a fellow servant. The affirmative matter of the answer was controverted of record.

The trial resulted in a verdict against the telephone companies for $700.00 each, and against the appellant Kentucky Utilities Company, for $1,400.00. Judgment was rendered in accordance with these verdicts. The defendants were refused a new trial, but only the Kentucky Utilities Company has appealed.

It appears from the record that the appellant, Kentucky Utilities Company, for several years has maintained a line of poles and wires along the turnpike from Lexington, by way of Tyrone, to Lawrenceburg, Kentucky; that the three telephone companies mentioned have maintained lines of poles and wires on the opposite side of the same highway, and that by an arrangement with the appellant, made shortly before appellee received his injuries, they were, near Tyrone, transferring their wires to cross-arms attached to the poles of the Kentucky Utilities Company. It also appears from the evidence, and is undisputed, that the appellant, Kentucky Utilities Company's poles are thirty-five feet high and that about eight inches from the top of each of them is a cross-arm supporting three uninsulated copper wires, over and by means of which it transmits from Lexington, to Lawrenceburg, for the lighting of that town and perhaps points beyond an electric current of eleven thousand volts; that four feet below the top cross-arm, on which these three uninsulated copper wires are attached, was another cross-arm bearing two insulated copper wires, over which was conducted a weaker current of electricity, of about two thousand volts, used for lighting the town of Tyrone. It is admitted that the two insulated wires used for the lighting of the town of Tyrone were carrying no current of electricity at the time appellee was injured. It further appears from the evidence that the lines that were being transferred by the three telephone companies to appellant's poles were being attached to cross-arms on the appellant's poles about four and a half feet below the two insulated wires of the Kentucky Utilities Company, which put them at a distance of about eight and a half feet below appellant's uninsulated copper wires on the top cross-arms of its poles.

The work of placing these wires was being conducted by the appellee, William Searcy, John Wedmore and

J. G. Highbarger, employes of the three telephone companies, under the control of H. L. Short, their manager. They had been engaged at this work about three days when the accident occurred resulting in appellee's injuries. In doing the work they used two ropes—non-conductors—which were fastened to the ends of the wires, the latter being in rolls or bales. The ropes were tied to pieces of wood and Wedmore and Highbarger pulled the wires along over the cross-arms by means of the wood, which they used as handles. Short and Searcy handled the bales and uncoiled and let out the wires as they were pulled along over the cross-arms by Wedmore and Highbarger. After conducting the work in this manner for some time, Short, the manager, concluded that greater progress could be made by handling one wire at a time, so a single wire was attached to the end of the rope which was used for stretching the wire in place, and Wedmore and Highbarger still did the pulling and stretching of the wire while Searcy handled the bale from which it was uncoiled. In doing this work one of the men, taking the rope with him, would climb the pole until he reached the cross-arm and would then throw the rope over the cross-arm and allow it to dangle to the ground. Thereupon the man on the ground would take hold of the rope and pull or stretch the wire over the cross-arm until it reached the next pole, when the same thing was gone through with. In thus doing the work there was no danger in pulling and stretching the wires of their coming in contact with the three uninsulated copper wires at the top of the pole, eight and a half feet above. Besides, there were the two insulated wires between them and the wire being put in place. Shortly before the accident, Short, the manager, was called away and was absent at the time appellee was injured. Immediately preceding the accident the wire handled by Wedmore, Highbarger and appellee became entangled and hung on a cross-arm of a pole of the Cumberland Telephone & Telegraph Company, whose poles and wire were located on the same side of the highway and contiguous to the poles of appellant; the poles of the Cumberland Telephone and Telegraph Company being, however, only twenty-five feet in height, which placed its lines ten feet below the three uninsulated wires at the top of appellant's poles. In trying to loosen the wire thus entangled on the cross-arm of the Cumberland Telephone & Tele-

graph Company, Wedmore, who was up at a cross-arm on appellant's pole, to which it was to be fastened, took the rope attached to the wire from Highbarger's hand and attempted to flip it loose from the entanglement and into its proper position, in doing which he jerked with such unnecessary force that the wire pulled loose from the cross-arm on the pole of the Cumberland Telephone & Telegraph Company and flew up a distance of eight and a half feet, which brought it in contact with one of the eleven thousand volt uninsulated wires situated on the cross-arm at the top of appellant's pole, and as a result of such contact of the wires a current of electricity was transmitted to appellee, who was at the time standing on the ground at the other end of the wire and holding it, thereby producing the shock and injuries to him complained of.

The only ground urged by appellant for a reversal is that the trial court erred in refusing to grant the peremptory instruction asked by it after appellee's evidence was heard and again at the conclusion of all the evidence. The rule as announced in Mangums' Admr. v. Louisville Electric Light Co., 127 Ky., 476, and in numerous other cases, requires that those who manufacture and use electricity must exercise the utmost care to protect others from its danger; they are not insurers for the manufacture and sale of electricity is lawful; but in handling so dangerous an agency care proportionate to the danger must be observed, and to this end nothing short of the utmost care is sufficient, and this rule must be applied here.

The single ground upon which the recovery was rested was that the appellant was negligent in failing to insulate the wires, with one of which the telephone lines held by appellee came in contact, thereby causing his injuries. So the question is, did the mere failure of appellant to insulate wires maintained at a distance of thirty-five feet above the ground manifest the absence of such care as is required by the rule above stated? It is contended by appellant that insulation of these wires is impossible, and this being so the only care required of it was to place and maintain them at such a height from the ground as that persons, in no way charged with the duty of keeping them in repair, could not reasonably be expected to come in contact with them, which care was exercised in placing them thirty-five feet from the ground and in re-

quiring the telephone companies, in making use of its, poles, to attach their wires thereto below and at a distance of eight and a half feet from the uninsulated, wires.

Is it true that wires of the voltage carried by these cannot be insulated? In determining this question we must be governed by the evidence appearing in the record, and the only evidence we find with respect thereto is containd in the testimony of Minor Carman. The witness, after being questioned in regard to his knowledge of the custom with reference to the electric current maintained on wires used as were the uninsulated wires of appellant and showing his knowledge thereof, testified as follows:

"Q. 15. What is said custom? A. The high tension wires or transmission wires are not insulated. Q. 16. Why is that true, Mr. Carman? A. It would be what we would say impossible to insulate those wires. Q. 17. Now why is it not possible to insulate wires of that character? A. Wherever there is an electrical current there is bound to be a magnetic field. You can't insulate against magnetism. Q. 18. Is it customary for utilities companies and power companies never to insulate wires of this character carrying a voltage of eleven thousand? A. I don't remember of ever seeing any wires insulated carrying that high voltage."

On cross-examination the witness further testified as follows:

"Q. 13. As I understand you, you say that high tension wires cannot be protected or insulated? A. To the best of my knowledge wires carrying eleven thousand volts cannot be insulated, that is so you could handle them with any safety. Q. 14. Don't you know that they put wires in cables. A. Not carrying eleven thousand volts. Q. 15. Can't they put them under the ground? A. I don't recall any eleven thousand voltage wires under the ground. Q. I didn't ask you that, I asked you, could they do it? A. I don't think so. Q. 17. It is the cost that would prohibit it, is it not? A. I don't see how they could insulate them. Q. 18. Don't you know they do it in cities, are they not constructed under the streets? A. Not carrying eleven thousand volts. Q. 19. How much do they carry? A. Usually and to the best of my knowledge, about twenty-three hundred volts. Q. 20. Do they carry enough voltage to run big factories and machin-

ery? A. Yes in the transmitters,. but not as far as from Lexington to Lawrenceburg. Q. 21. If it was placed under the ground for two or three squares, couldn't it be placed under the ground from Lexington to Lawrenceburg? A. They don't place eleven thousand voltage wires under the ground. Q. 22. Do you know anything about how they are placed in the city of Louisville, the electric wires? A. Placed in conduits. Q. 23. That protects them doesn't it? A. Yes, sir. Q. 24. Well, if the twenty-three hundred could be placed in conduits why couldn't the eleven thousand? A. Because the eleven thousand or high voltage wires create a magnetic field. Q. 25. Then do you mean to say that electric companies using eleven thousand voltage wires cannot at all protect the public against it, just run through the country without any protection to the public, is that what you mean to say? A. They are always placed so high that the public will be protected. Q. 28. Then they could protect or insulate wires carrying twenty-three hundred volts, couldn't they? A. They insulate them but they are not considered safe to handle. Q. 29. What is the highest voltage insulated wires, you know of? A. If I remember correctly, the highest voltage wires I have seen insulated is thirty-two hundred. Q. 30. Then these wires, they could have some of these wires with less voltage and insulated; take eleven thousand for instance, they could carry the same quantity of electricity and have them break in the transmitter from Lexington to Lawrenceburg? A. Not to the resistance of the wire. Q. 31. Do you mean to say that one wire carrying eleven thousand voltage, I mean can carry eleven thousand voltage from Lexington to Lawrenceburg and three wires couldn't be used instead of one wire, is that what you mean. A. Every electrical plant, or in other words, the construction and the size of the wire is approximated according to the current that will be used, then the proper voltage applied to that wire according to the distance it is to be transmitted. Q. 32. Read him the question Mr. Stenographer. (Thereupon the stenographer read to the witness the preceding Question 31). By the witness: It could not. Q. 33. Then you have got to put it all in one wire, you can't put it in three? A. Not in one wire, if you can understand it; of course the three wires, three phase circuit is better than a two phase circuit; of course there is greater capacity to the three than there is to

the two. Q. 34. You have never had any experience except in Kentucky? A. No, sir, I don't think I said that. Q. 35. Well, I believe you said you only knew the custom in Kentucky, that was it? A. If I remember correctly, I said the highest voltage that wires carrying eleven thousand volts in Kentucky are not insulated. Q. 36. Didn't you answer Mr. Curtis and say that you knew the custom of electrical companies of Kentucky only? A. Of the Kentucky Utilities Company. Q. 37. No, in Kentucky? A. I think that is correct. Q. 38. Now, what other plants have you any knowledge of other than the Kentucky Utilities Company? A. Of the Kentucky Public Service Company and of a number of electric light companies operating in smaller towns throughout the State and also in other states."

It is apparent from the testimony of this witness, which is uncontradicted and, in the absence of anything to discredit the witness, must be taken as true, that it is impossible to insulate wires carrying eleven thousand volts. It is, however, insisted for appellee that Carman did not qualify himself to testify as an expert. This objection, we think without merit, as it appears from the statements of the witness that he had an experience of seven years in constructing and managing telephone lines; that he was familiar with the methods of insulation, had read a great deal upon the subject and had much to do with the joint ownership and control of telephone and lighting and power company wires and was particularly informed as to the plants of the Kentucky Utilities Company and the Kentucky Public Service Company. It is, therefore, manifest from the only evidence heard on the trial that there is no possible device or method that might be adopted whereby wires used for transmitting eleven thousand volts of electricity can be insulated; and fairly apparent from the evidence that such voltage was necessary to the carrying of the electric current as great a distance as from Lexington to Lawrenceburg. Being unable to insulate its wires, the further question presented is what other step or steps could appellant have taken to prevent contact with its wires. Nothing more, we think, than to have placed them at such a height from the ground as to make them free from danger where persons had a right to go on business or pleasure, and this end was accomplished by fixing and maintaining them thirty-five feet above the ground. In

other words, we are of the opinion that in thus maintaining its wires, which could not be insulated, the appellant used the utmost care to protect the public from the danger to be anticipated from contact with them.

In Mayfield Water & Light Co. v. Webb's Admr., 129 Ky., 395, it appears that a child eleven years of age was killed by coming in contact with an uninsulated electric wire eighteen feet above the ground, which he could reach only by climbing a pole or walking a guy wire. It was held that the recovery had in the circuit court was unauthorized, because an electric wire eighteen feet above the ground, which could only be reached by climbing a pole or guy wires stretched from the pole to the ground at an angle of forty-five degrees, was not a dangerous instrumentality attractive or alluring to children.

In Rogers' Adm'r. v. Union Light, Etc. Co., 123 S. W., 293, we held that while electric companies must exercise the highest degree of care to make and keep insulations of electric wires perfect at places where people have a right to go on business or pleasure, such care was not required as to one who had no right whatever to be upon or about the pole or wires, as was the case with decedent at the time of being killed by an uninsulated wire.

It cannot be said that in consenting to the use of its poles by the telephone companies appellant placed itself under any duty to exercise greater care to protect their employes from danger from its wires than theretofore rested upon it. The work of attaching the telephone wires to appellant's poles did not require the telephone companies' employes to come in contact with or nearer than eight and a half feet of the uninsulated electric wires; and appellant could not have reasonably anticipated that Wedmore, in untangling a telephone wire from the pole of the Cumberland Telephone & Telegraph Company where it had accidentally caught, at a point twenty-five feet from the ground, would do such an unusual and unexpected thing as to jerk it with such force as to cast it such a height as to bring it in contact with appellant's uninsulated wire. The truth is, but for this act of Wedmore, his fellow servant, appellee would not have been injured, and in so acting Wedmore was guilty of negligence which was the proximate cause of appellee's injuries. Even if the negligence attributed to appellant

by the allegations of the petition had been shown by the evidence, under the facts here presented, it could not have been regarded the proximate cause of the injury. As said in Logan v. C., N. O. & T. P. Ry. Co., 139 Ky., 202, quoting with approval from 29 Cyc., page 496:

"A prior and remote cause cannot be made the basis of an action if such remote cause did nothing more than furnish the condition, or give rise to the occasion by which the injury was made possible, if there intervened between such prior or remote cause and the injury a distinct, successive, unrelated, efficient cause of the injury. If no danger existed in the condition except because of the independent cause, such condition was not the proximate cause * * *." 29 Cyc., 492-493; Georgetown Telephone Co. v. McCullough's Admr., 118 Ky., 182; Risque's Admr. v. C. & O. R. Co., 104 Va., 476.

A person six feet in height, on appellant's pole at the place where Wedmore had to stand in attaching the telephone wires to the cross-arm, could not well have reached high enough to touch appellant's uninsulated wires, and there was nothing in the character of the work being performed by him and appellee that could possibly have required either of them to come in contact with the uninsulated wire. Moreover, there would have been no difficulty in one of the telephone employes climbing up the pole of the Cumberland Telephone & Telegraph Company and disengaging the wire where it had caught, and if this course had been pursued the accident resulting in appellee's injury would not have happened. Furthermore, it appears from the evidence that appellee and his fellow workmen had full knowledge of the danger to be apprehended from coming in contact with the uninsulated wires. During the three days they had worked in putting up the telephone wires, they had discussed among themselves the noise and vibrations made on appellant's uninsulated wires by the unusually high current of electricity passing over them, and appellee had previously worked for the telephone companies for months under and near these lines of the appellant.

In Wight v. Cumberland Telephone & Telegraph Co., 137 Ky., 299, we held that the rule requiring the master to furnish a reasonably safe place for the servant to work is subject to the exception that the servant assumes risks resulting from changes made in the place of

work by him in the ordinary progress of the work, and this exception applies with greater force to a case in which the person injured does not sustain the relation of servant to the owner of the instrumentality by which his injuries were caused, and the conditions resulting in the injury were created by the negligence of a fellow workman. Wight was injured because of the failure of himself and a fellow servant in removing a telephone from a residence to take the precautions which would have prevented a severed telephone line from coming in contact with a contiguous wire charged with electricity. In the opinion it is said:

"The proximate cause of the accident was the failure of these men to take the wire down in the manner provided for them with a rope. The danger was before their eyes, they could but know it, and it was incumbent upon them in handling this wire, which of necessity would come down upon the trolley when cut off at the pole, to take the precautions which would protect them from the consequences. They had no right to neglect the precautions which the commonest prudence suggested for their own safety; for it is well known that insulation often will not protect from a strong voltage of electricity, where one wire is thus rubbed or dragged against another, and they had no right to rely on an insulation intended only for protection while the wire was up to protect them from danger in pulling the wire down and thus omit all precautions for their own safety. The danger here did not come from the electricity furnished by the telephone company. The power it uses is not dangerous. The danger came from the electricity of the street railway company; and in working around the trolley and pulling the wires across it, it was incumbent on these men to use such care for their own safety as the circumstances reasonably demanded."

Although the facts of the case *supra* are not altogether analagous to those of the instant case, the principle it announces is applicable to the latter.

It is our conclusion that appellant was entitled to the peremptory instruction asked in the court below; and because of the error committed by the court in refusing it, the judgment is reversed and cause remanded for a new trial consistent with the opinion.