ARKANSAS POWER & LIGHT COMPANY *v.* CATES.

Opinion on Rehearing Delivered January 27, 1930.

1004

*Raymond Roddy, W. H Holmes, Harry E. Meek* and *Robinson, House & Moses,* for appellant.

*Tom W. Campbell* and *W. R. Donham,* for appellee.

MEHAFFY, J., (on rehearing). On the 30th day of April, 1915, the town council of Waldo, Arkansas, passed an ordinance granting to the Arkansas Power & Light Company for fifty years ''a free right-of-way for the erection and maintenance of poles and wires with the nec-

essary appurtenances thereto for the purposes of operating and transacting a general electric light and power plant business over, through and upon all the streets, alleys, roads and highways within the boundaries of the present and future limits of the town of Waldo, Arkansas. The said poles shall be placed at points on a line where streets and sidewalks come together." Section one of the ordinance.

Section four of the ordinance reads as follows: "That the latest method of construction and good material shall always be used, and the wires shall be insulated so as not to endanger life or property in the maintenance and operation of the aforesaid light and power plant."

Section five of the ordinance reads as follows: "This ordinance, upon its acceptance in writing by the Arkansas Light & Power Company, filed with the clerk or recorder of the incorporated town of Waldo, Arkansas, shall constitute a contract between the Arkansas Light & Power Company, its successors and assigns, on the one hand, and the incorporated town of Waldo, Arkansas, on the other."

Thereafter, the Arkansas Power & Light Company, as provided in section five of the ordinance, accepted in the following language: "To the Mayor and City Council of Waldo, Arkansas: The Arkansas Power & Light Company, by H. C. Couch, its president, being duly authorized, hereby accepts the franchise granted, passed and approved on the 30th day of April, 1915. Arkansas Power & Light Company, by H. C. Couch, President."

The Arkansas Power & Light Company sold its property in Waldo, but re-acquired it in 1925. In 1915 and for ten years thereafter the distribution system in Waldo was 6,600 volts. After the appellant re-acquired the property, and until 1926, the wires carried 6,600 volts. But in 1926, so far as the record shows, without any authority from the town of Waldo, the voltage was increased from 6,600 volts to 13,000 volts. The wires carrying the high voltage were not insulated. Two of them

were wrapped, and, according to the evidence of appellant, the wrapping was for protection against the weather. But the third wire, the one nearest the building, was not wrapped or insulated in any way.

In 1928 a two-story brick building was erected on Main Street, the second story being 4½ feet from the inside wire, the one that was not wrapped or insulated, and this wire was on a level with the top of the windows in the second story.

Appellee's intestate, Virgil L. Cates, was in the employ of the Gay Oil Company of Little Rock, which company operated a filling station in the building above mentioned. His duties for his employer took him to Waldo, and, on November 15, 1928, while there, he discovered an electric sign which had not been attached to the building. He employed a contractor, Frank Spradling, to put up the sign, and attach it to the building which was done according to directions. This was accomplished by twisting together two No. 9 wires, attaching them to the end of the sign, running them through a vent hole in the wall of the building and fastening them to a joist in the attic above the second story, which left the sign hanging about 16 feet above ground. After the wire was fastened to the joist in the attic, Spradling's helper, Johnson, broke off the surplus wire, and pushed it back through the vent hole. Spradling, who was on a ladder near the sign, was pulling the surplus wire through the vent, and, by reason of a crook on the end of the wire it caught in the mortar joint between the brick. The lower end of the wire extended down to the ground and appellee's intestate took hold of it to assist Spradling in pulling it through the vent. Spradling jerked the wire loose, and it fell over against the heavily charged electric wire, causing a short circuit, the entire force of the electric current passing through Cates' body, which caused his death.

This suit was instituted by his widow as administratrix to recover damages for herself and two minor

children, and for his estate. The trial resulted in a verdict and judgment against appellant for $10,000.

As stated by appellant: "Nothing is involved in this appeal except the sufficiency of the testimony to sustain the verdict." And appellant insists the case should not have been submitted to the jury. Therefore, there is no question for us to consider, but the sufficiency of the evidence to sustain the verdict.

The ordinance provided, among other things, that the wires shall be insulated so as not to endanger life or property in the maintenance and operation of the aforesaid light and power plant.

Section five of the ordinance provides, among other things, that upon the acceptance in writing by the Arkansas Power & Light Company, filed with the clerk or recorder of the incorporated town of Waldo, Arkansas, shall constitute a contract between the Arkansas Light & Power Company, its successors and assigns, on the one hand, and the incorporated town of Waldo, Arkansas, on the other.

Thereafter, the Arkansas Power & Light Company accepted in the language above set forth, and it thereby became a contract, binding upon both parties.

The evidence introduced on the part of the appellant tends to show that the provisions of the ordinance were complied with except the insulation of the wires, and appellant insists that there is no negligence on the part of the appellant for failure to insulate its wires. They earnestly contend that because witnesses testify that, if the wires had been wrapped, it would have been no protection, but that does not in any way show that if the wire had been properly insulated it would not have been a complete protection. It may be that no type of wrapping could have been a protection, but this ordinance was passed and accepted by the Arkansas Power & Light Company, and became a contract which the Arkansas Light & Power Company and its successors were bound to comply with. And appellant insists that insulation

can only mean the proper and standard size and type of poles and cross-arms and insulators.

The ordinance provides that the company shall always use the latest method of construction and good material. If appellant's contention were true, that would cover all that it was required to do under the ordinance, because its contention is that proper construction meant the standard construction, and that they complied with the ordinance in that way. But the ordinance says they must do that, meaning, certainly, in addition to that, the wires shall be insulated so as not to endanger life or property.

Appellant does not contend that it insulated the wire so as to be of any protection whatever, but insists that, "but from the standard point of the public, it is now recognized as safer to have 6,600- and 13,000-volt wire bare, and this distinguishes the high voltage from the low voltage wire, and acts as a signal to put the public on notice that, since these wires are bare, they carry a high voltage and should be avoided." But that is not the ordinance; not the contract. The contract is to insulate the wires, and by this promise to insulate the wires it secured the passage of the ordinance. It was not required to accept the ordinance, but it did do so and the ordinance itself expressly provided that, when it did, it became a contract.

Some of appellant's witnesses testify that it would be expensive and impracticable, and that it would not be feasible. Whether it was not feasible or practicable and was very expensive is immaterial. The company contracted to do this. It evidently knew at the time that it could insulate the wires of 6,600 volts, and knew whether it was feasible, knew how expensive it would be, and knew whether it was practicable. It certainly knew more about these things than the other contracting party, and it agreed to do this.

"Inconvenience, or the cost of compliance, though they might make compliance a hardship, cannot excuse a

party from the performance of an absolute and unqualified undertaking to do a thing that is possible and lawful. Parties *sui juris* bind themselves by their lawful contracts, and courts cannot alter them, because they work a hardship. The rights of the parties must be measured by the contract which they themselves made. A contract is not invalid, nor is the obligor therein in any manner discharged from its binding effect, because it turns out to be difficult or burdensome to perform. Nor will unforseen difficulties, however great, excuse him. The law regards the sanctity of contracts.'' 6 R. C. L. 929.

Most of appellant's witnesses did not testify that it would be impossible to insulate wires with 13,000 volts, but they testified that it would be expensive. They, however, did not testify to facts showing how expensive it would be or how much it would cost to insulate the wire. They simply testify that it would be expensive, and one witness says it would be ridiculous.

The fact that it is expensive or ridiculous would not excuse the appellant from performing its contract. But, if it did, the testimony in this case is not with reference to any facts; no witness testifies to how much it would cost, nor do they testify to any facts that would prevent it from being feasible. What the witnesses of appellant might think was expensive or not feasible might not agree with what others would think was feasible or inexpensive, and, for that reason, if this question was involved, the witnesses would not be required to give their opinion of these things, but give the facts, and let the jury determine from the facts whether it was feasible or not.

One cannot contract to do a thing and then, because witnesses testify that it was unreasonable or expensive, be discharged from its obligation. In the first place, this is not material. The ordinance required the wires to be insulated, and the appellant accepted the ordinance, and it was bound to insulate the wires, no matter whether it was expensive or feasible or not. But, even if it could

not insulate the wires, it would be required to provide other means of safety that would be equally as effective as the insulation of the wires.

This court has recently held: "There is involved here no question about the duty of the electric company to insulate all its wires. The authorities appear to be unanimous in holding that there is no such duty, but the cases do hold, as we understand them, that this duty must be performed, or other sufficient safety methods employed to prevent contact with wires conveying the current at such places as danger of contact may reasonably be anticipated." *Hines* v. *Consumers' Ice & Light Co.,* 168 Ark. 914, 272 S. W. 59; *Morgan* v. *Cockrill,* 173 Ark. 910, 294 S. W. 44; 9 R. C. L., 1213, § 21.

The above authorities, as said in *Morgan* v. *Cockrill, supra,* have recognized the true rule, but it is the rule under the common law, and where there is no ordinance or statute. In the instant case the above rule would be correct if there had been no contract and no ordinance. And it would require, without any regard to the ordinance as held in these cases, that the duty of insulating the wires must be performed, or other sufficient safety methods employed, to prevent contact with wires conveying the current at such places as danger of contact may reasonably be anticipated. But, without regard to the ordinance, it might be reasonably anticipated that a wire carrying 13,000 volts within 4½ feet of a building was a situation from which it might reasonably be anticipated that persons would come in contact with the wire.

The above is the rule, as we have said, without regard to statute or ordinance, and would be a question for the jury, and not the witnesses to determine. The court cannot say wires should not be insulated because some witnesses swear it would be expensive or would not be feasible. This court has always held that the wires must be insulated or other sufficient safety methods employed to prevent contact with wires conveying the current at such

places as danger of contact may reasonably be anticipated.

"Not infrequently the duty of insulating electric wires is imposed by municipal ordinance, and in such a case persons whose business or duty takes them in proximity to such wires have the right to assume that the law has been complied with, and if an electric company fails to perform the obligation thus placed upon it, such failure is *prima facie* evidence of negligence, entitling a person injured by reason of such omission to recover damages unless guilty of contributory negligence." 9 R. C. L. 1224; 20 C. J. 361.

This is the well-established rule and has been repeatedly approved by this court.

"It is manifest that, in passing the ordinance prescribing the height of the wires of the telephone company, and of the street railway company, and their relative distance from each other when it was necessary for their wires to cross each other, the council recognized the danger to the public when these wires came in contact, and had in view the protection of persons who had a right to travel upon the streets. The passage of the ordinance was a municipal regulation, authorized by the laws of the State, and has the force of a statute within the limits of the city. It was the duty of the defendant companies to comply with the ordinance, and failure to do so is *prima facie* evidence of negligence on their part. These principles are established by the following cases." *S. W. Tel. & Tel. Co.* v. *Myane,* 86 Ark. 548, 111 S. W. 987; *Hayes* v. *Michigan Central Rd. Co.,* 111 U. S. 228, 4 S. Ct. 369; *Mitchell* v. *Raleigh Electric Co.,* 129 N. C. 166, 39 S. E. 801, 55 L. R. A. 398, 85 Am. St. Rep. 735; *Bush Electric Light & Power Co.* v. *Lefever,* 55 S. W. 396; *Knowlton* v. *Des Moines Edison Light Co.,* 117 Iowa 151, 90 N. W. 818; *Clements* v. *La. Electric Light Co.,* 44 La. Annual, 692, 11 So. 51, 16 L. R. A. 43, 32 Am. St. Rep. 348.

Within the city limits of Waldo the ordinance, as held by this court, had the force of a statute. It had the

same force as if the Legislature had passed a law requiring wires to be insulated; that is, the same force within the limits of Waldo.

Cates was an employee of the Gay Oil Company, and his duties took him to Waldo and other places, presumably to look after the interest of the company, and he saw the sign that had not been put up, and arranged to have this sign put up. He employed Spradling to do this, but Cates himself was assisting in the matter, and was therefore where he had a right to assume that the company had complied with the law, and that therefore there was no danger. He was killed, while in the discharge of his duties in a place where he had a right to be, because the company had not complied with the law.

"A company maintaining electrical wires, over which a high voltage of electricity is conveyed, rendering them highly dangerous to others, is under the duty of using the necessary care and prudence at places where others may have a right to go, either for work, business, or pleasure, to prevent injury. It is the duty of the company, under such condition, to keep the wires perfectly insulated, and it must exercise the utmost care to maintain them in this condition at such places. And the fact that it is very expensive or inconvenient to so insulate them will not excuse the company for failure to keep their wires perfectly insulated." 1 Joyce on Electricity, 735; *Duncan Electric & Ice Co.* v. *Chrisman*, 59 Okla. 57, 157 Pac. 1031.

The above rule is also stated by another writer in substantially the same language, and, continuing, he says: "This statement of the rule implies that, in the absence of statute or municipal ordinance, it is not necessary to insulate wires which are so placed that no one could reasonably be expected to come in proximity to them." Curtis on Electricity, 765; 20 C. J. 355.

But the wire which was not insulated and which caused Cates' death was so placed that it would be reasonably expected in putting the sign on the building that

persons engaged in this work might come in proximity to the wire. At any rate, it certainly could not be held, as matter of law, that it would not be reasonably expected that persons would come in proximity to the wire.

The authorities are practically unanimous in holding that a failure to comply with a statute or ordinance is *prima facie* evidence of negligence. The facts in this case are that the ordinance was passed imposing the duty to insulate the wires. This duty was not performed, and, by reason of the failure to comply with the ordinance, Cates was killed when he was at a place where he had a right to be, and he had the right to assume that the appellant had complied with the ordinance. But, if there had been no ordinance requiring the wires to be insulated, and had been no contract, it was the duty of the appellant to insulate its wires where it might reasonably be anticipated that persons pursuing business or pleasure may come in contact with them. In this case a wire carrying 13,000 volts was within 4½ feet of the building. Cates was on the ground helping to pull a wire from the building. When the wire came loose, it fell and came in contact with the wire of the appellant and Cates was killed. He had a right to help hang the sign, and had a right to be where he was.

The appellant, however, insists that, if its wire had been ten feet from the building, this wire that was pulled out by Cates would have reached it. This is a mere matter of opinion and is given by the witnesses as opinion. It was a question of fact for the jury. This was not an iron rod, but a wire, and persons might very well have different opinions as to where and how it would have fallen if the appellant's wire had been further away. It is not for the court or the witnesses to say what their opinion is, but it is a question for the jury. Appellant, however, says it was not required to insulate the wire, because it would not have been feasible or practicable and would have been very expensive. This, if true, would not relieve the appellant.

"Considering the dangerous character of the force produced by the gas company, there was a duty imposed on each to see that the wires into which it was sent were properly insulated. The danger was exactly the same, whether the wires were owned by one or both of the corporations. When one, through the instrumentality of machinery, can accumulate or produce such deadly force as electricity, he should be compelled to know that the means of its distribution are in such condition that those whose business or pleasure may bring them in contact with it may do so with safety. * * * If the wires were not properly insulated, and the death resulted therefrom, then both companies are liable, as it was the duty of the street railway company to have its wires properly insulated, and there was a duty resting on the gas company to see it was done before charging them with electricity." *Maysville Gas Co.* v. *Thomas,* (Ky.) 75 S. W. 1129; *Thomas* v. *Maysville Gas Co.,* 108 Ky. 224, 56 S. W. 53, 53 L. R. A. 147.

"Either the wire must be insulated, or it must be so located as to be, comparatively speaking, harmless. If the company does not choose to properly insulate a deadly wire of its maintenance, it must place the same underground, at a high altitude, or at some inaccessible place." Curtis on Electricity, 772.

It is true that the two-story house was built after appellant's wire was put up, but when the building was erected it was the duty of the appellant to use ordinary care with reference to the building and proximity to the wire after the erection of the two-story building.

"The duty of an electric company in reference to keeping its appliances in safe condition is a continuing one. Not only must it exercise a high degree of care in the original selection and installation of its electric apparatus, but thereafter it must use commensurate care to keep the same in a proper state of repair. The obligation of repairing defects does not mean merely that the company is required to remedy such defective conditions

as are brought to its actual knowledge. The company is required to use active diligence to discover defects in its system. In other words, an electric company is bound to exercise due care in the inspection of its poles, wires, transformers and other appliances." Curtis on Electricity, 699.

The evidence in this case shows that appellant knew all about the erection of the building, and knew the proximity of the wire to it, and it was its duty to exercise care, either to insulate it, put it under ground, or elevate it so that there would be no reasonable apprehension of persons rightfully there coming in contact with its wires.

It has been uniformly held that the question as to the negligence of the company, where one comes in contact with a dangerous wire, is for the jury, and it is always the duty of a company in conveying a current of high potential to exercise commensurate care under the circumstances; and it is required to insulate its wires and to use reasonable care to keep the same insulated whenever it may reasonably be anticipated that persons pursuing business or pleasure may come in contact therewith. See Curtis on Electricity, 765.

It is argued by appellant that the injury would have occurred if the wires had been 8 or 10 feet from the building, and they state that the evidence of Dice that they should have been at least 6 feet from the building, cannot indict the appellant company with negligence. It is true that Dice said that he had not had experience in plants of that kind, but no one needs experience to know that a wire without insulation that close to a building would be very much more dangerous than if removed at some distance away. And no experience is needed to know that, if the wires were elevated sufficiently, it would be safe. And Dice had had experience in constructing a plant and setting poles and wires, and testified that wires should have been at least 30 or 35 feet high. A competent electrician or an expert in anything would know no more about this fact, that it would be less

dangerous to put them up 30 or 35 feet than where they were, 4½ feet from the building. But, at any rate, we think under all the authorities that the negligence of the company was a question for the jury.

Appellants state that the case of *Kentucky Utilities Co.* v. *Searcy,* 167 Ky. 840, 181 S. W. 662, is a perfect illustration of the matter they are discussing. That is, with reference to the testimony of Dice and the expert witnesses. About the questions there being discussed, an expert would probably know more than a nonexpert, because the testimony referred to in the Kentucky case was testimony with reference to whether or not wires carrying 11,000 volts could be insulated. Certainly, a nonexpert witness would not know whether it could or could not, but in that case the wires were approximately 30 feet high, and the telephone company's wires were attached to the electric company's poles about 4½ feet below the two insulated wires of the Kentucky Utilities Company, which put them at a distance of about 8½ feet below appellant's uninsulated wires. Here was a distance of 8½ feet from the telephone wire to the uninsulated wire, but the question of negligence in maintaining that wire and in knowing that to put it 30 or 35 feet would be safer than where it was put, and to put it at a greater distance from the building would make it more safe, is within the knowledge of everybody who observes the situation. Of course a nonexpert witness would not be able to testify about how and when wires could be insulated.

They held in the Kentucky case that the undisputed proof showed that it was impossible to insulate wires carrying 11,000 volts. That is not the undisputed proof here because one of the appellant's witnesses testified that wire of 100,000 volts could be insulated. But, whether it could or could not, makes no difference, because, if it could not be insulated, then they had no right to place it and maintain it at a place where people would be reasonably certain to come in contact with it; or where it might reasonably be anticipated that they would come

in contact with it. If they can not do one, they must do the other. They must, as said by numbers of authorities, either put them underground, insulate them, or elevate them so that they will not maintain them at a place where it may be anticipated that persons will come in contact with them.

It is next contended that the evidence conclusively shows that Cates' death was due to an accident over which the company had no control. It is well established by the decisions of this court that no one is responsible for a mere accident. But there is no evidence of accident in the instant case at all. But, whether the injury resulted from accident or otherwise, of course was a question of fact and was determined by the jury against the appellant. Besides, the word "accident" means an effect that takes place without one's forethought or expectation. An effect which proceeds from an unknown cause or an unusual effect of a common cause and therefore not expected; a casualty or contingency.

The appellant asked no instruction in the court below on the question of an accident, and the case was tried by both parties on the questions of negligence of appellant and contributory negligence of Cates, and no other theory was advanced. No mention was made of accident until the appellant's brief was filed in this court.

If injury could be reasonably anticipated from persons coming in contact with the wire, then it was no accident. In fact, there is nothing in the evidence in this case that tends to show that the injury was accidental in the sense of excusing the persons who maintained the wire from liability.

All these questions that are argued now by the appellant were questions of fact properly submitted to the jury.

"It is the province of the jury to pass upon the conflict in and the weight of the testimony, and the fact that the testimony is conflicting, and that the verdict may even appear to be contrary to the preponderance of the testi-

mony, furnishes no ground for reversal." *Hyatt* v. *Wiggins,* 178 Ark. 1085, 13 S. W. (2d) 301; *S. W. Bell Tel. Co.* v. *McAdoo,* 178 Ark. 411, 10 S. W. (2d) 503; *Ark. Power & Light Co.* v. *Orr,* 178 Ark. 329, 11 S. W. (2d) 761; *Mo. Pac. Rd. Co.* v. *Juneau,* 178 Ark. 417, 10 S. W. (2d) 867; *Mo. Pac. Rd. Co.* v. *Edwards,* 178 Ark. 732, 14 S. W. (2d) 230; *Western Union Tel. Co.* v. *Downs,* 178 Ark. 933, 12 S. W. (2d) 887; *Wright* v. *State,* 177 Ark. 1089, 9 S. W. (2d) 233; *Turner* v. *State,* 109 Ark. 138, 158 S. W. 1072; *Peoples Bank* v. *Brown,* 136 Ark. 517, 203 S. W. 579; *Harris* v. *Wray,* 107 Ark. 281, 154 S. W. 499; *Gazola* v. *Savage,* 80 Ark. 249, 96 S. W. 981.

It is next contended by appellant that the death of Cates was caused by his own voluntary act. The only voluntary act, so far as the proof shows, is that he employed Spradling to hang a sign, and he was assisting him with it. We have already said that he had a right to assume that the company had not been guilty of negligence and to act accordingly, and, if he did that, it was not his voluntary act, but the negligence of the company that caused the injury. These questions, that is, the questions of contributory negligence, accident, and voluntary act of Cates were all questions of fact properly submitted to the jury, and the jury found against the appellant, and their finding is conclusive here.

There is ample evidence to sustain the verdict, and the judgment of the circuit court is affirmed.

HART, C. J., SMITH and McHANEY, JJ., dissent.