SOUTHWESTERN GAS & ELECTRIC COMPANY *v.* DESHAZO.

4-5796 138 S. W. 2d 397

Opinion delivered February 26, 1940.

*Abe Collins, W. C. Rodgers* and *Downie & Downie,* for appellant.

*Jas. S. McConnell* and *George R. Steel,* for appellee.

BAKER, J. Mrs. Deshazo filed a suit against three farmers residing in Howard county and against the two appellants, named above, and procured a judgment of $2,000 on account of alleged negligence, causing her

rather severe injuries. The three farmer defendants cut a green pine tree, growing upon the land of one of them. It stood about fourteen or fifteen feet off the fifty foot right-of-way of the Southwestern Gas & Electric Company, and nearly or about forty feet from the nearest line which was charged with electricity of 33,000 volts. The long distance telephone lines of the Southwestern Bell Telephone Company are said to have crossed this high voltage line in perhaps two or three different places. There is no showing upon this appeal, when these lines were built, but there is no allegation or proof that they had been permitted to deteriorate on account of long standing. The principal charges made against the telephone and electric companies are stated in two paragraphs, constituting the actual negligence set up. They are: "1. Constructing their lines to cross one another adjacent to standing timber and without insulation. 2. Permitting their lines to cross each other in such close proximity as to permit them to contact one another, without being properly insulated."

At the time of the injury, Mrs. Deshazo was employed at the switchboard of the office of the local telephone company at Dierks. The long distance telephone line of the Southwestern Bell Telephone Company ran into this office. The three farmers who were sued cut down a pine tree for stove wood. It was perhaps from forty to forty-five feet high. The testimony shows that they cut it properly so as to cause it to fall, under ordinary conditions, parallel with the high tension lines of the Southwestern Gas & Electric Company. It appears, however, that there was a vine that had grown and connected the top of the tree that these men cut with another nearby tree, and that this vine caused the falling tree to swing to one side and strike one of the lines carrying the high voltage current. The lines broke and as it fell to the ground it sagged until it came in contact with the telephone line of the Southwestern Bell Telephone Company. On account of this contact, the high voltage current was conducted to the telephone office three or four miles away, and the plaintiff says that she was very severely shocked and injured. The matter of her injuries,

we think, is properly foreclosed by the verdict of the jury, which gave her a recovery of $2,000 against the two corporations, but this same jury, at the same time, returned a verdict in favor of the three farmers who were defendants in this same suit, absolving them from any charge of negligence.

It becomes necessary in this case to consider the facts as developed in relation to the alleged negligence of the two corporate appellants. One of the charges is that they built their service lines too close to each other, adjacent to standing timber and without insulation. The appellee does not argue that either one of the appellants should have gone upon the land of Mr. Brandon and cut timber which could have possibly fallen upon one of these lines carrying high voltage electricity or that if a line was to be constructed it should have been placed in a region where there was no standing timber. There is no argument that the construction of the line through country where the timber was growing was an act of negligence. There is some argument, however, in regard to the construction of electrical appliances according to rules fixed by the National Electric Safety Code, as it has been adopted by the Department of Public Utilities in Arkansas, but there seems to be no dispute as to the actual facts developed upon trial. We shall attempt on account of that fact to state separately the issues as they have been argued by the appellants and the appellee and state our conclusions upon each matter of apparent or real importance.

The first matter that appears is that the proximate cause of that unfortunate occurrence was the cutting of this particular pine tree, which fell and broke a high tension wire. Certainly if this tree had not been cut by the three farmers, who have been exonerated from all negligence, there would have been no broken line, no contact of one line with another and the plaintiff would never have received the shock from which she suffered. If this were the sole proximate cause of the injury, the appellee must fail in her suit to recover compensation for the injuries alleged. The authorities governing this situation are numerous. A few typical ones are here

cited. *Pittsburg Reduction Co.* v. *Horton,* 87 Ark. 576, 113 S. W. 647, 18 L. R. A., N. S., 905; *Bona* v. *Thomas Auto Co.,* 137 Ark. 217, 208 S. W. 306; *Morgan* v. *Cockrill,* 173 Ark. 910, 294 S. W. 44; *St. L. I. M. & So. Ry. Co.* v. *Bragg,* 69 Ark. 402, 64 S. W. 226, 86 Am. St. Rep. 206.

But appellee urges that there was faulty construction in that these lines were permitted "to cross each other in too close proximity to each other and to standing timber," the lines not being properly insulated. The National Electric Safety Code adopted by the Department of Public Utilities of this state has made suitable regulations for lines that cross each other. While these regulations may be regarded as official, and as furnishing, under ordinary circumstances, reasonable margins of safety in the conduct of those who construct and maintain such electric systems, it may perhaps be said that such regulations prescribe only the minimum of care that should be tolerated under such circumstances and conditions; but certainly if such minimum of care be taken and exercised in such construction work, then one who asserts defects such as to make the construction or maintenance dangerous must assume the burden of proving the particular acts or conditions that constitute the negligence complained of. The proof in this case does not show any facts in regard to faulty or negligent construction. For instance, in regard to trees, Rule 281, paragraph A, was offered in evidence. It provides that: "Where trees exist near supply line conductors they shall be trimmed, if practicable, so that neither the movement of the trees nor the swinging or increased sagging of conductors in wind or ice storms or at high temperatures will bring about contact between the conductors and the trees. Exception. For the lower voltage conductors, where trimming is difficult, the conductor may be protected against abrasion and against grounding through the tree by interposing between it and the tree a sufficiently nonabsorptive and substantial insulating material or device. B. At wire crossings and railroad crossings as far as practicable, from overhanging or decayed trees which might fall into the line."

We find no provision in these rules, or any part thereof, that the owner of the high tension lines should anticipate every possible condition whereby a sound, green tree, approximately forty feet away might be so broken down or storm-swept as to make it necessary to go upon the land of another and cut trees, or move the line already constructed, should a tree on land adjacent thereto, though belonging to another, grow to a sufficient height that it might at some time be blown across such line. The proof in this case is not that there was any sagging condition of any line. There was not any overhanging tree. There was no decayed tree, nor is there a requirement in law that those who construct and maintain wire circuits should anticipate the falling of any sound, green tree, or that it might be cut by the owner, or, if cut, that a vine growing in the top might cause it to fall so as to break some wire and cause damage. The witnesses tell us also that such wires, or lines, where they cross shall be at least six feet apart according to the rules of National Code of Safety, and those who are experienced in such construction say under ordinary conditions such allowances could not be criticized as improper. In this cause, however, the facts are undisputed that the lines were twelve feet apart, that is to say that the electric lines carrying the high voltage were twelve feet higher than the telephone lines which crossed below. The proof also shows that these high tension lines were properly built above the smaller or lighter lines of the telephone company, so if six feet be a reasonable clearance, twice that distance furnished greater protection.

The proof fails to show there was sagging, and close or dangerous proximity of one line to another, except that caused by the conduct of the three farmers held blameless. But there does remain the charge that these lines were in such close proximity as to permit them to "contact one another without being properly insulated." That was a charge, but there was no such evidence. We assume, and we think the record discloses that these high tension lines of the electric company and the telephone lines were without any covering as insulation. One of the rules of the Safety Code in regard to insulation

is rule 114, page 41, par. 5. We are told it contains this provision: "The insulating covering on parts exceeding 750 volts to ground shall not be considered a protection."

We understand this announcement or declaration to mean that the usual covering upon electric wires, where the current exceeds 750 volts, may not be deemed to be a protection against the current carried by the wire. We cannot and do not agree with appellee that there is a practical method of insulation of high tension wires by some form of covering. If there is, the experts who testified in this case did not tell about it, nor does any witness suggest that there is any practical method in use. There is a possibility that a line of almost any voltage might be insulated. We do not pretend to know what it is. We know sometimes that cables are carried under ground or even under water, but, for practical purposes, in sparsely settled communities such requirements of insulation are met by isolation; that is to say, the construction or building of the lines high in the air. So the form of insulation ordinarily used in cross country electric systems is the system of isolation, by which lines are built twenty-five or thirty feet above the ground, far out of reach, and without danger to anyone, except meddlers and trespassers. The National Electric Safety Code and also our Department of Public Utilities indicate that a system constructed as was the electric system in this instance is one that may be properly maintained and that its location, high in the air, is the kind of insulation approved by experts; and not a word of testimony has been offered by appellee or any other witness in this case indicating that such construction as was maintained by both the electric company and the telephone company was negligent in the slightest degree. Certainly, we cannot say as a matter of law in the face of this record that because there was injury, a recovery may be had. On several occasions this matter of insulation has been discussed by this court and no case has been cited for our consideration indicating that there was negligence, either in the construction or maintenance of the high tension lines, isolated as these were, according to the undisputed proof in this case.

In our consideration of this identical question we announced: "There is involved here no question about the duty of the electric light company to insulate all its wires. The authorities appear to be unanimous in holding that there is no such duty, but the cases do hold, as we understand them, that this duty must be performed, or other safety methods employed to prevent contact with wires conveying the current at such places as danger of contact may reasonably be anticipated." Supporting this statement is a citation to 9 R. C. L. at § 21, Electricity, p. 1213. *Hines* v. *Consumers' Ice Co.*, 168 Ark. 914, 272 S. W. 59.

Again at a later date we said: "This court has recognized the true rule in *Hines* v. *Consumers' Ice Co.*, 168 Ark. 914, 272 S. W. 59, where it was said:" Then followed the exact quotation above from the Hines case. *Morgan* v. *Cockrill,* 173 Ark. 910, 294 S. W. 44.

In the last cited case there was a reversal because of errors in instructions. One of these was because the trial court told the jury that the defendant "owed to the public a high degree of care," etc., and that if the defendant "failed to exercise a high degree of care," etc., plaintiff should recover. This was held to be error in that ordinary care was all that was required.

In a more recent case we again considered the matter of insulation. Although we held by a divided court that in the particular case insulation was properly a requirement and that a recovery should be sustained upon the failure to insulate all electric wires in the city of Waldo, this opinion is not of controlling effect here. The reason given for this holding was the fact that there was an ordinance requiring such insulation. This ordinance had been accepted by the electric company and was recognized as a contract. We said after quoting the identical statement above set out from *Hines* v. *Consumers' Ice Co., supra,* "The above authorities as said in *Morgan* v. *Cockrell, supra,* have recognized as the true rule, but it is the rule under the common law, and where there is no ordinance or statute." There is, in addition, a recognition of the application of this "true rule" in the absence of legislation. *Arkansas Power &*

*Light Co.* v. *Cates,* 180 Ark. 1003, 24 S. W. 2d 846. Since no contractual obligation exists in the instant case it furnishes no rule in regard to insulation except the one universally recognized.

In technical phraseology one of the experts testified: "The voltage would arc from one line three and one-half inches to another." That is an expression which the ordinary layman interprets as a "jump," so it would appear that any practical method of insulation, by covering the wire, must be sufficient to prevent this arc or "jump" and such insulation has not yet been developed, we are told, that might be put to reasonable use without undue and unnecessary increase of weight. One expert said: "To my knowledge we do not have an insulating material that is light enough in weight and practical in overhead lines for voltage that high."

As we understand the facts developed in this case they are substantially as we have stated above. There is no controverted question or matter in dispute therein. The remaining facts in regard to appliances at the telephone office, or exchange, where appellee was employed, are without dispute. The parties have argued some matters in regard to the ground wire at the telephone exchange. As we understand, this exchange was one operated by the local telephone company at Dierks, which is not a party to this suit. In the establishment of this system at this office it had constructed or made a proper ground to which its wires had been attached, in order that there might be carried away any overcharge of electricity that might be caused by lightning or otherwise. We do not understand that there is any dispute about the sufficiency of this ground. The appellant, Southwestern Bell Telephone Company, when it established its long distance line, connected it to this same ground in the station, and did not construct or make a new or different ground. There is no insistence by anyone who pretends to know that this was improper in construction or insufficient. Several witnesses who were not parties to this suit gave evidence in which they described the safety devices by which any overcharge of electricity or any surge of power that might come from natural causes, lightning,

or otherwise may be carried off. These appliances were not constructed or built, or installed with the sole idea of the protection of the switchboard or system. The testimony is to the effect that if the current actually were permitted to enter upon the switchboard and there were not a proper ground through the protective devices, the switchboard would be seriously impaired or damaged. These devices are for the protection of employees or patrons who may be connected with the system by any kind of contact, if a surge of energy should come over the wires. The proof is to the effect that these protective devices that were so employed were all of standard make and quality, of the highest efficiency known at this time; that they did in fact operate properly when this great voltage of power was thrown suddenly upon the line and they carried this power away without damage to the switchboard.

There was further evidence of the proper operation of these protective devices in the fact that the fuses were melted or burned out, not only at the Dierks' plant, or office, but also in one at Center Point, some miles away. If we understand the effect of this testimony, and it seems there can be no doubt about it, if these devices had not operated properly, most likely the switchboard would have been burned up or destroyed and probably the appellee would have been killed instantly.

All these matters were set forth in minute detail and there is not a word of dispute among any of the witnesses testifying in regard thereto, nor is there a suggestion by appellee nor any witness that there is any system more modern, more efficacious than the one employed at the time she is said to have been seriously shocked.

The only other matter upon this appeal that merits comment is the argument made on the part of appellee that the judgment should be sustained upon the doctrine of *res ipsa loquitur*. We do not agree to that theory. This court is committed to the theory announced in 45 C. J. 1206, § 774 C, that ". . . the presumption or inference arising from the doctrine cannot be availed of, or is overcome, where plaintiff has full knowledge and tes-

tifies as to the specific act of negligence which is the cause of the injury complained of, or where there is direct evidence as to the precise cause of the accident and all the facts and circumstances attendant upon the occurrence clearly appear.''

The same announcement in principle is made upon the subject of negligence in 20 R. C. L. 156. We think it may be announced that the only instance in which the rule of *res ipsa loquitur* applies must be that the act or thing causing the injury must have been under the exclusive control and management of the one charged, and it will not apply except when the occurrence must be such as in the ordinary course of events it does not happen when due care has been exercised. In such instances, it is said a rebuttable presumption arises that there was negligence on account of which plaintiff may recover, unless the defendant, or one charged, offers evidence to meet and offset or rebut the presumption. But in all cases where all the facts attending the injury are disclosed by the evidence and nothing is left to inference, certainly no presumption can be indulged. In this case there are several things that were not found within the control or management of either of the defendants. The first of these is that three farmers who cut the tree acted independently. The tree and the manner of its falling was certainly not within any power or authority of the defendants to control or direct in any way. There is no evidence that any one had any knowledge that the top of this tree that was cut was tied or connected by a vine to another tree. There is no showing that the electric company had any control over or management or direction in any sense of the long distance telephone line, nor is there any connection of the telephone company to the electric line. Certainly the electric company had no control over the office of the telephone company nor the grounding of any of the wires. It did not even have the right or power to make an inspection, and if there had been a defect, to correct or repair the same.

We think it must appear from the rendition of this verdict and consequent judgment that whatever negligence the jury may have suspected upon which to render

a verdict must have been one common to both the defendants. There is certainly no reason to render a verdict and judgment against one of these corporations for any matter of commission or omission on the part of the other, but such alleged negligence must, as just suggested, have been one common to both; and, in an analysis of this case, we can think of only two matters, that is the position of one line to another and the fact that there was no insulation. Only one was near the tree that was cut down. We have already discussed both of these matters and we think it must be apparent to anyone who would give thought to the subject that there should be no requirement that one line should not cross another under such reasonable rules and regulations as experience has taught may be applied for safety; and we have already seen that a requirement for absolute insulation is unreasonable and impracticable.

Since all these facts are known, nothing is left to inference. There is certainly no presumption of negligence arising out of the fact of the injury. If we should so hold, our decision would be tantamount to a declaration that electric and telephone utilities must operate under the burden of being insurers against injury to anyone who might come in contact with wires or appliances anywhere and be thereby shocked or injured. We are without power so to legislate, and if we had such power would not be inclined so to exercise it.

We think the case must be reversed, (1) for the reason that the only proximate cause of the injury here is the act or conduct of the three farmers who have been wholly freed and exonerated from all blame by the finding of the jury; (2) all the facts have been developed with reference to the construction of the systems operated by each of the utilities with no evidence of negligence. They are shown to have been constructed in accordance with the rules and requirements of the National Electric Safety Code and even with wider margins of safety than are required thereby. That such code had been approved by the Department of Public Utilities of this state necessarily constitutes a *prima facie* showing of the lack of negligence on the part of each of the said

utilities, particularly when considered in the light of this record wherein there is no evidence that there was any defect.

In conclusion, it is certainly not within the rule of *res ipsa loquitur,* as has heretofore been announced by this court in cases we have considered. We are unwilling to extend that rule to include cases developed as this one has been. The seriousness of plaintiff's injuries and absence of negligence on her part cannot, under the above circumstances, supply proof of negligence otherwise wholly wanting.

No good purpose can be served by a reversal for new trial.

The judgment is, therefore, reversed, and the cause is dismissed.

HUMPHREYS and MEHAFFY, JJ., dissent.

MEHAFFY, J. (dissenting) I think this case should be affirmed. The opinion of the majority states: ''The first matter that appears is that the proximate cause of that unfortunate occurrence was the cutting of this particular pine tree, which fell and broke a high tension wire. Certainly if this tree had not been cut by the three farmers, who have been exonerated from all negligence, there would have been no broken line, no contact of one line with another and the plaintiff would never have received the shock from which she suffered. If this was the sole proximate cause of the injury, the appellee must fail in her suit to recover compensation for the injuries alleged. The authorities governing this situation are numerous.''

The first case cited by the court to support this declaration is the case of *Pittsburgh Reduction Co.* v. *Horton,* 87 Ark. 576, 113 S. W. 647, 18 L. R. A., N. S. 905. In that case a 13-year-old boy picked up a cap and took it home and kept it about a week, and then, when playing with it, it exploded and injured him. The evidence, however, showed that the reduction company had been guilty of no negligence, kept the caps inside the building in a proper place, and it was not known how they got out of the building. The court stated, how-

ever: "It is a well settled general ru'e that if, subsequent to the original negligent act, a new cause has intervened, of itself sufficient to stand as the cause of the injury, the original negligence is too remote. The difficulty arises in each case in applying the principle to a given state of facts."

The court further said, in speaking of the boy's mother: "She admits that when he would leave them on the floor she would pick them up and lay them away for him. This continued for a week, and then, with her knowledge, he carried them to school. Her course of conduct broke the causal connection between the original negligent act of appellant and the subsequent injury of the plaintiff. It established a new agency, and the possession by Charlie Copple of the caps or shells was thereafter referable to the permission of his parents, and not to the original taking. Charlie Copple's parents having permitted him to retain possession of the caps, his further acts in regard to them must be attributed to their permission, and were wholly independent of the original negligence of appellants."

The next case relied on to support the majority opinion that the farmers' cutting the tree down was the proximate cause of the injury, is *Bona v. S. R. Thomas Auto Co.,* 137 Ark. 217, 208 S. W. 306. The court in that case said, after citing a number of cases: "It is equally well settled by the decisions of our own and other courts that 'where two concurring causes produce an injury which would not have resulted in the absence of either, the party responsible for either cause is liable for the consequent injury'."

The next case relied on to support the conclusion of the majority, is the case of *Morgan v. Cockrill,* 173 Ark. 910, 294 S. W. 44. In that case the court said, in speaking of electric companies' duties: "This duty is not limited to keeping their own wires out of the streets, or other public highways, but extends to the prevention of the escape of the dangerous force in their service through any wires brought in contact with their own, and of its transmission thereby to any one using the streets."

The majority opinion then refers to the case of *S. L. I. M. & So. Ry. Co.* v. *Bragg*, 69 Ark. 402, 64 S. W. 226, 86 Am. St. Rep. 206. That was a suit against the railroad company to recover for fright. There is no question in it of the intervention of some other person. The party alighted from the train of her own volition, being assisted by the employees of the company. She did not get off at the place she wanted to, but a few feet away. She was not a stranger and the court held that putting her off negligently a few feet from the place she desired to get off was not the cause of her fright.

The facts in none of these cases above cited are at all similar to this case, and I do not think any one of them supports the holding of the majority.

"Any number of causes and effects may intervene between the first wrongful cause and the final injurious consequence; and if they are such as might, with reasonable diligence, have been foreseen, the last result, as well as the first, and every intermediate result, is to be considered in law as the proximate result of the first wrongful cause. The question always is, was there any unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury?" 22 R. C. L. 135.

"Thus it is not necessary that the proximate cause be the sole cause, but it must be a concurring cause, such as might reasonably have been contemplated as involving the result under the attending circumstances; where several causes concur to produce certain results, either cause may be termed a 'proximate cause,' if it is an efficient cause of the result in question." 50 C. J. 842.

Considering the dangerous character of the force produced by the electric company, there was a duty imposed on it to see that its wires were properly insulated. If not insulated, it must place its wires underground or at some inaccessible place, where they will

not be likely to do any harm. When one can accumulate or produce such a deadly force as electricity, he should be compelled to know that the means of its distribution are in such condition that those whose business brings them in contact with it may do so in safety, and if this dangerous force causes injury because some third person cuts a tree down on the wires, the electric company is not only liable, but its act is the proximate cause of the injury.

"The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it. The primary cause may be the proximate cause of disaster, though it may operate through successive instruments, as an article at the end of a chain may be moved by a force applied to the other end, that force being the proximate cause of the movement, or as in the oft cited case of the squib thrown in the market place." *Milwaukee & St. Paul Ry. Co.* v. *Kellogg*, 94 U. S. 474, 24 L. Ed. 256; *Scott* v. *Shepherd*, 2 W. Bl. 892.

When one had control of as dangerous an agency as electricity and transmits it over wires, there might be one or twenty independent agencies, and still the original company that controls the electricity would be liable; its action would be the proximate cause. Like the case of *Scott* v. *Shepherd, supra,* where one threw a squib into a market place where there were many people, and one after another picked up the squib and threw it to get it away from himself, and finally exploded and injured a person, the man who first threw the squib was held liable and his act was the proximate cause.

"In other words, it is sufficient to constitute proximate cause that the negligence for which recovery is sought was the efficient cause which set in motion the chain of circumstances leading up to the injury itself *(Wengert* v. *Lyons,* (Mo. App.), 273 S. W. 143; *Strayer* v. *Quincy, O. & K. C. R. R. Co.,* 170 Mo. App. 514, 156

S. W. 732) ; and the primary cause will be the proximate cause where it is so linked and bound to the succeeding events that all create or become a continuous whole, the first so operating upon the others as to make it primarily productive of the injury." *Cregger v. City of St. Charles,* 224 Mo. App. 232, 11 S. W. 2d 750.

"We think it is sufficient to constitute proximate cause that the negligence for which recovery is sought is the cause which sets in motion the chain of circumstances leading up to the injury, and the primary cause will be the proximate cause where it is so linked and bound to the succeeding events that all create or become a continuous whole, with the first so operating on the others as to make the primary cause productive of the injury. The question of proximate cause and the defense of intervening causes is usually a question for the jury. . . . We think it may be said that in this state the doctrine of concurrent negligence applies. A defendant may be liable even if the injury was not caused by his sole negligence. If his negligence concurred with that of another and became a part of the direct and proximate cause, he was liable, although not the sole cause. And these acts of negligence are questions for the jury." *Jenkins v. Springfield Traction Co.,* 230 Mo. App. 1235, 96 S. W. 2d 620.

Where a truck driver left the gate open where a large hog was confined in a dry pen and the hog escaped, went into a corn field and frightened a team, it was held that leaving the gate open was the proximate cause of injury, and among other things, the court said: "Further, the evidence was sufficient in our opinion to authorize a finding by the jury that plaintiff's injuries were the natural and probable consequences of the leaving of the gate open by the driver of the truck, through which the hog confined therein passed out and into the cornfield and came upon the plaintiff's team and frightened it and caused it to run." *Hockaday v. Panhandle Eastern Pipe-Line Co.,* 66 S. W. 2d 956.

The authorities are practically unanimous in holding that the question of proximate cause and the defense of

intervening causes is usually a question for the jury. I think it a question for the jury in this case, and not one for the court.

There may be no provision in the rules, as said in the majority opinion, that the owner of the high tension lines should anticipate every possible condition whereby a sound, green tree approximately forty feet away might be so broken down or storm swept as to make it necessary to go upon the lands of another and cut the trees; but there is a provision in the law that in handling an agency as dangerous as electricity, the company handling it should exercise the highest degree of care. It should either insulate its wires, or place them underground, or in some inaccessible place.

As this court recently said: "A company maintaining electrical wires, over which a high voltage of electricity is conveyed, rendering them highly dangerous to others, is under the duty of using the necessary care and prudence at places where others may have a right to go, either for work, business, or pleasure, to prevent injury. It is the duty of the company, under such condition, to keep the wires perfectly insulated, and it must exercise the utmost care to maintain them in this condition at such places. And the fact that it is very expensive or inconvenient to so insulate them will not excuse the company for failure to keep their wires perfectly insulated." *Ark. P. & L. Co.* v. *Cates,* 180 Ark. 1003, 24 S. W. 2d 846.

The majority opinion states that the electric company is only required to exercise ordinary care, and cites the case of *Morgan* v. *Cockrill,* 173 Ark. 910, 294 S. W. 44, where the case was reversed because of the giving of an instruction requiring a high degree of care. But the court said in that case: "This case varies with danger which will be incurred by negligence. In cases where the wires carry a strong and dangerous current of electricity, and the result of negligence might be exposure to death or most serious accident, the highest degree of care is required." Every authority cited in that case

that discussed the degree of care, holds that the highest degree of care is required where the wires carry a dangerous current of electricity.

Of course the cutting of the tree by the farmers was not the intervention of such an agency that would relieve the appellant from liability. They might have cut one or forty trees where they were, and such act would not have injured the telephone operator four miles away. The reason she was injured was because of the high voltage of electricity carried over the wire.

I, therefore, respectfully dissent from the holding of the majority, and believe that under the circumstances and evidence in this case, the facts were for the jury, and that the judgment should have been affirmed. Mr. Justice HUMPHRIES agrees with me in the conclusions herein stated.