**CITY OF BRADY, TEXAS, Appellant,**

v.

**Tommy FINKLEA, Appellee.**

No. 25224.

United States Court of Appeals
Fifth Circuit.

Sept. 10, 1968.

Royal H. Brin, Jr., Dallas, Tex., Craig Porter, San Angelo, Tex., for appellant.

Ben Davis Geeslin, Brady, Tex., Jack C. Eisenberg, L. Tonnett Byrd, Austin, Tex., for appellee.

Before THORNBERRY and SIMPSON, Circuit Judges, and ATKINS, District Judge.

ATKINS, District Judge:

The City of Brady, Texas, appeals from a judgment of $136,207.00 entered for the plaintiff at the conclusion of the trial to the court without a jury. The appellant assails the jurisdiction of the trial court, the findings of fact and conclusions of law entered by the trial judge, and the amount of the verdict as excessive. We affirm.

Tommy Finklea, as administrator and guardian, brought a wrongful death action on behalf of the surviving widow and children of Charles A. Wolf as against the City of Brady, Texas. Without dispute, Wolf, hired by the Brady Independent School District to do electrical work, was electrocuted while replacing light bulbs at the Brady School District football field on the evening of September 3, 1963. The lights at the football field had been constructed in 1935 pursuant to an agreement of the School District and the City whereby the City constructed an electrical distribution system to the Brady High School football field and thereafter provided electrical current through the system. The electrical distribution system consisted of high-voltage "primary" lines which carried 2400 volts from the City's power plant to a transformer pole, pole number 3, located at the northwest corner of the high school grounds. The School District paid the City for the construction of the electrical system.

The diagram in the appendix portrays the appearance of the electrical system prior to Mr. Wolf's death.

Primary lines on the transformer pole, pole number three, were connected to the insulators located on the crossarm attached near the top of the east side of the pole. A jumper wire was then connected to the primary lines and looped under the crossarm to another insulator located on a crossarm attached near the top of the west side of the pole. The transformer converted the electrical current from 2400 volts to 110 and 220 volts which was carried to the football field by three "secondary" lines. These secondary lines, as pictured in the diagram, were enclosed on three sides by the jumper wire attached to the primary line. In effect, the primary line formed a loop which passed over, around and underneath the three secondary lines. A switch used to turn off the electrical current in the secondary lines is located at the base of the pole.

On the evening of September 3, 1963, the deceased and four of his employees met at the football field to replace burned out stadium lights and to repair an electrical scoreboard. Wolf, wearing a safety belt, climbing hooks and high-voltage gloves, prepared to climb pole five, a pole serviced by the secondary lines leading from the transformer pole,

in order to replace light bulbs. At his direction, one of Wolf's employees pulled the switch attached to the transformer pole turning off the lights on the west side of the stadium. Wolf died almost instantly from an electric shock he received when his head was approximately four feet below the light bulb he was going to change. His electrocution occurred because an insulator fell from the top crossarm attached to the west side of the transformer pole. The 2400 volt primary line fell across and energized the secondary lines going to pole five where Wolf was working. The crossarm had rotted away at the place where the insulator was attached. At the time of Wolf's death the transformer pole was still rigged as it had been originally constructed by the City in 1935.

The findings of fact and conclusions of law entered by the trial judge establish the liability of the City as follows:

1. When pole No. 3 was originally constructed and rigged, the City strung the 2400 volt primary lines underneath the crossarms rather than over the top of them. This was negligent construction and rigging in 1935, and was a proximate cause of Wolf's death.

2. When pole No. 3 was originally constructed and rigged, the City connected the 2400 volt primary lines to the transformer in such a way as to make a loop over and around the secondary lines coming out of the transformer. This was negligent construction and rigging in 1935 and was a proximate cause of Wolf's death.

3. The City failed adequately to inspect and maintain pole No. 3 and its equipment. Such failure was negligence and a proximate cause of Wolf's death.

4. [The] failure of the City to install and maintain a warning system which was capable of giving proper notice of an existing ground in the system of sufficient magnitude to cause death was negligence and a proximate cause of Wolf's death.

■ Notwithstanding the appellant's argument to the contrary and the citation to some purported contrary authority, the test on appeal in this case is the "clearly erroneous" test. It is correct that the Court on a prior occasion did state:

Insofar, however, as the so-called 'ultimate fact' is simply the result reached by processes of legal reasoning from, or the interpretation of the legal significance of, the evidentiary facts, it is 'subject to review free of the restraining impact of the so-called "clearly erroneous" rule.' Lehmann v. Acheson, 3 Cir., 206 F.2d 592, 594. As succinctly stated by Professor Moore, 'findings of fact that are induced by an erroneous view of the law are not binding. Nor are findings that combine both fact and law, where there is error as to the law.' 5 Moore's Federal Practice, 2d Ed., Sec. 52.03(3), p. 2631. Galena Oaks Corporation v. Scofield, 218 F.2d 217, 219 (5th Cir. 1954).

Elsewhere in the opinion the Court did state:

It is also true, however, that the burden of showing a finding of fact 'clearly erroneous' is not a measure of exact and uniform weight. Under the circumstances of each case, it depends on whether 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 [1947]. Ibid.

The findings of fact entered by the trial judge were not induced by an erroneous view of the law and we are much concerned with whether upon review of the entire evidence it can definitely and firmly be concluded that a mistake has been committed—a mistake necessitating a reversal. Appellate counsel must not,

however, lose sight of the fact that it was the trial judge that had the opportunity to see and hear witnesses, to observe their demeanor on the stand, and thereby the better to judge of their credibility.

Roy Krezdorn, a professor of electrical engineering at the University of Texas and qualified as an expert in energy transmission and conversion, based upon two separate inspections of the City's distribution system on two different occasions, testified the construction in 1935, whereby the primary line was looped around the secondary lines, was a "dangerous" and "unsafe method of rigging the transformer Pole No. 3." He stated that this method of rigging pole 3 did not meet the basic minimum safety requirements of the engineering profession in 1935 and was well below the minimum safety standards of the profession at that time. In particular, the following question was posed to Mr. Krezdorn and the corresponding answer was given by him:

Q. Now, tell the Court, Professor Krezdorn, why, in your opinion, that not only the looping around, but the going under the crossarm was unsafe, dangerous and well below the standards of the engineering profession, both now and in 1935.

A. In embracing the secondaries within the loop of the primary, the red inside the black, you created a hazard; in case you have a failure of crossarm, or of the crossarm pin, the insulator or the conductor of the primary voltage, it can fall into the secondary voltage or the secondary lines. Even if your secondary lines were to fall, they could fall into the primary line, which is under them, so you have created a potentially hazardous situation."

The appellant argues that the testimony of two witnesses establish as a matter of law that the City of Brady was not negligent when it installed the transformer pole in 1935. Edward Geeslin, the City's Superintendent of Utilities at the time of the construction of the lighting system at the football field, made mention of technical specifications that were worked out by out-of-town engineers with General Electric or Westinghouse. It appears that General Electric or Westinghouse, whichever was the case, furnished engineering aid primarily in connection with the size wire needed to light the lamps and the number of lamps that were needed and did not give advice relative to the detail of pole construction. Significantly, Mr. Geeslin testified:

Q. It did not contain the detail of pole construction did it?

A. No, the way I recollect that, we got that from other fields that had been constructed in this area.

Q. Did you drive around and look at them?

A. I am pretty sure we did.

The appellant also relies upon the testimony of plaintiff's expert, Krezdorn. It makes much of the fact that he testified that on his first check of the electrical system of the football field he found nothing wrong. It was only after his second inspection just before trial that he concluded what was wrong with the construction of the system. The explanation for Mr. Krezdorn's testimony lies in the fact that his first inspection occurred over two years after the dangerous situation on the transformer pole had been corrected. According to the testimony of a Lloyd Harris, an employee of the City, he repaired the transformer pole on September 4, 1963, at the request of his supervisor. He explained how he replaced the rotten crossarms

with a new set, put in new insulators, installed a voltage disconnect between the primary line and transformer, and strung the primary line over the top set of crossarms. Mr. Krezdorn, obviously, could find no fault with the construction of the transformer pole when he first inspected it. The fact that he could find fault after his second inspection does not discredit his testimony. Evidently Mr. Krezdorn had learned from others how the transformer pole was rigged at the time of Mr. Wolf's death. He may not have had this information when he made his first inspection.

■■ The appellant argues that constructing the transformer pole with a jumper wire beneath the crossarm rather than on top of it is not in violation of any provision of the National Electrical Safety Code. According to it there is no negligence where the requirements of the Code are met. The argument is without merit. The Code was not adopted by Texas until 1949. Assuming its relevancy to the issue of negligence, although seriously doubting it, the Court concludes that compliance with the Code, assuming there was compliance, does not ipso facto free the City of negligence. The provisions of the Electrical Safety Code provide broad minimum requirements for electric companies to follow. Evidence of compliance or non-compliance with the Code is properly considered in determining if the construction of an electrical distribution system meets the common law standard of care under a given set of facts. Eg. Southwestern Gas & Electric Co. v. Deshazo, 199 Ark. 1078, 138 S.W.2d 397 (1940); Douglas v. Maloney, 105 Cal.App.2d 284, 233 P.2d 59 (3rd Dist. 1951); Probart v. Idaho Power Co., 74 Idaho 119, 258 P.2d 361 (1953); Vaught's Administratrix v. Kentucky Utilities Co., 296 S.W.2d 459 (Ky.Ct.App.1956); Daniel v. Oklahoma Gas & Electric Co., 329 P.2d 1060 (Okl. 1958); Kingsport Utilities v. Brown, 201 Tenn. 393, 299 S.W.2d 656, 69 A.L. R.2d 87 (1955); Burnett v. Rutledge, 284 S.W.2d 944 (Texas, Amarillo Civ.

App.1955, n. r. e.); Northern Virginia Power Co. v. Bailey, 194 Va. 464, 73 S. E.2d 425 (1952). According to the common law of Texas:

A company maintaining electrical wires over which a high voltage of electricity is conveyed, rendering them highly dangerous to others, is under the duty of using the necessary care and prudence at places where others may have the right to go, either for work, business, or pleasure, to prevent injury. Tri-County Elec. Coop. v. Clair, 217 S.W.2d 681, 685 (Texas, Ft. Worth, Civ.App.1949, n. r. e.); West Texas Utilities Co. v. Renner, 53 S.W.2d 451, 454 (Texas, Com.App., 1932, approved).

■ The appellant, in its reply brief, again relies upon the testimony of Mr. Geeslin when he said that the details for construction of the transformer pole were taken from others that had been constructed in the area. The attitude of the Courts of Texas toward electricity is well exemplified in the following statement:

Electricity is a silent, deadly, and instantaneous force; and one who uses it for profit is bound to exercise care corresponding to the dangers incident to its use. San Antonio Gas & Electric v. Ocon, 105 Tex. 139, 146 S.W. 162, 164, 39 L.R.A.,N.S., 1046 (1912).

Local usage, general custom, and conformity with a uniform custom of persons engaged in a like business, while they may be considered as evidence of proper care, do not preclude a showing that the custom itself is a negligent custom. Kuemmel v. Vradenburg, 239 S. W.2d 869 (Texas, San Antonio Civ.App., 1951, n. r. e.); Texaco, Inc. v. Joffrion, 363 S.W.2d 827 (Texarkana Civ.App., 1962, n. r. e.). We accordingly conclude that the trial judge did not err when he expressly found the transformer pole was negligently constructed by the City of Brady, Texas, in 1935.

■ Appellant's last argument challenging the trial judge's finding and conclusion of negligent construction is that the passage of 28 years from the time of construction until the date of the accident prevents the negligent construction from being a proximate cause of the decedent's death. The courts of Texas, as do most jurisdictions, adhere to the view that the mere lapse of time is but one element to be considered along with all other relevant facts in the case. E. g. Parking, Inc. v. Dalrymple, 375 S.W.2d 758 (Texas, San Antonio Civ.App.1964) (14 years); Texas Bitulithic Co. v. Caterpillar Tractor Co., 357 S.W.2d 406 (Texas, Dallas Civ.App., 1962 n. r. e.) (11 years); International Derrick & Equip. Co. v. Croix, 241 F.2d 216 (5th Cir. 1957) (7 years); Pryor v. Lee C. Moore Corp., 262 F.2d 673 (10th Cir. 1958) (15 years); Carney v. Sears, Roebuck & Co., 309 F.2d 300 (4th Cir. 1962) (15 months); Fredericks v. American Export Lines, 227 F.2d 450 (2nd Cir. 1955) (6 years); Leigh v. Wadsworth, 361 P.2d 849 (Okl.1961) (2½ years); Freeman v. Mazzera, 150 Cal.App.2d 61, 309 P.2d 510 (1957) (3 years); Burns v. Penn Rubber & Supply Co., 117 Ohio App. 12, 189 N.E.2d 645 (1961) (12 years). We agree with the appellee that the City did not have to foresee that the particular person who was killed would be killed 28 years after construction because the overhanging jumper wires connected to the primary wires would fall onto and energize the secondary wires due to the rotting of the crossarms and the failing of the insulator. It is sufficient for proximate cause purposes if the City, as a reasonably prudent person, could or should have foreseen that someone lawfully in the vicinity of the transformer pole or the secondary wires would likely be injured if the insulator were to fall. See Genell, Inc. v. Flynn, 163 Tex. 632, 358 S.W.2d 543 (1962). We think the City should reasonably have foreseen this occurrence.

Having concluded that the trial judge was not in error on at least one of his findings and conclusions of negligence and proximate cause, we are of the view that little would be accomplished in making an in depth examination relative to the trial judge's other findings of negligence. The judgment, if otherwise proper, will stand on the basis that the City of Brady, Texas, negligently constructed the transformer pole and that such negligence was the proximate cause of the decedent's death.

The questions remaining to be considered are: (1) Whether or not federal jurisdiction is present or absent; (2) whether or not the damages awarded are excessive; and (3) whether or not the trial judge erred in not finding that (a) the deceased was guilty of contributory negligence and that (b) he assumed the risk of death by electrocution.

The challenge to Federal jurisdiction is premised on the assertion that the appointment of Tommy Finklea, a California resident, as administrator of the estate of the Texas deceased was invalid because there was no application for the appointment, no issuance and service of citation, and no hearing as required by local law. The appellant also relies upon the fact that the record in the guardianship proceedings shows that no citation was issued and served as required for temporary guardianship under local law. The appellant argues that because the appointment is invalid, he could not properly and lawfully appear as administrator or as guardian and he could not confer Federal jurisdiction on the basis of diversity of citizenship by virtue of his domicile in California. The deceased, his widow, and children were all residents of Texas. The defendant is a citizen of Texas.

■ It must be noted that the appellant stipulated in the pretrial order that jurisdiction was present. We do not now mean to imply that parties may by stipulation confer jurisdiction where none in fact exists. We do, however, find difficulty in accepting the appellant's argument. The City of Brady, Texas, chose by its stipulation to litigate

in the federal district court. It now, having lost the trial, seeks to escape from the judgment by attacking the jurisdiction of that court. Furthermore, it is settled that the decree of a state probate court naming an administrator cannot be collaterally attacked in federal district court in the absence of fraud. Mecom v. Fitzsimmons Drilling Co., 1931, 284 U.S. 183, 52 S.Ct. 84, 76 L.Ed. 233. Under the circumstances, we conclude the jurisdiction of the federal district court is not subject to challenge. The further argument of the appellant that Tommy Finklea was but a nominal administrator because only $885.00 out of the total award of $136,207.00 went to the estate is without merit. There is no evidence that his appearance in this case is a fraud upon the court. Rule 17(a) of the Federal Rules of Civil Procedure expressly provides that an administrator "may sue in his own name without joining with him the party for whose benefit the action is brought." We can find no fault with his appearance in this cause in his representative capacity as the named party plaintiff.

■ The appellant seeks to have this Court set aside the award of damages in the amount of $136,207.00, particularly with respect to the $85,910.41 awarded to Billye J. Wolf, the surviving widow. It asserts that the award is excessive because the Wolfs were separated in September 1962, a suit for divorce was filed, they reconciled in May 1963, commenced living together again as husband and wife in August 1963, and following Wolf's death, Mrs. Wolf remarried and obtained a divorce about nine months thereafter. The argument has no basis in law. A surviving widow's remarriage, or the possibility thereof, cannot affect the damages recoverable for wrongful death of her deceased husband. Gulf, C. & S. F. Ry. v. Younger, 90 Tex. 387, 38 S.W. 1121 (1897); Texas Elec. Ry. v. Stewart, 217 S.W. 1081 (Tex.Civ. App., 1920, writ refused). For a collection of authorities, see: 87 A.L.R.2d 252 (1963).

The final question presented is whether the trial judge erred in not finding that (a) the deceased was guilty of contributory negligence and that (b) he assumed the risk of death by electrocution.

■ In Texas, the defense of "assumed risk" applies *only* in cases involving the master-servant relationship. City of Teague v. Radford, 63 S.W.2d 376 (Tex.Com.App., 1933); Schiller v. Rice, 151 Tex. 116, 246 S.W.2d 607 (1954). But the similar doctrine of voluntary exposure to risk, *volenti non fit injuria*, is applicable to relationships other than master and servant. Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W.2d 172 (1951); Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368 (Tex.Sup.1963). We have considered the application of the latter doctrine to the facts presented.

The *volenti* [doctrine] * * * means * * * that a person may not recover for an injury received when he voluntarily exposes himself to a known and appreciated danger. In this state, the decision to incur the risk must have been deliberate; i. e., made with knowledge and appreciation of the danger so that it may be said that the person acted as a result of an intelligent choice. Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W.2d 172 (1951). Logically, a plaintiff cannot make an intelligent choice to confront a risk if he does not actually know of the danger, or know such facts as would in law charge him with knowledge of the danger and appreciation thereof. Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368, 379 (Tex.Sup., 1963).

We think that the danger involved in this case was not so openly obvious as to charge the decedent with full knowledge and full appreciation of it so that it may be concluded that he encountered the risk as the result of an intelligent choice.

The contributory negligence argument is precluded by the testimony of appellant's consulting engineer, Parrish. He was firm in his opinion that the decedent did everything a reasonable man

should have done prior to climbing pole five.

The judgment of the district court hereby is affirmed.

APPENDIX