210 So.2d 544 (1968)
The HOME INSURANCE COMPANY et al.
v.
A. J. WAREHOUSE, INC., et al.
A. J. WAREHOUSE, INC.
v.
UNION ASBESTOS & RUBBER COMPANY et al.
Nos. 1825, 1826.
Court of Appeal of Louisiana, Fourth Circuit.
May 6, 1968.
Rehearings Denied June 10, 1968.
*546 Hammett, Leake & Hammett, H. L. Hammett, New Orleans, for A. J. Warehouse, Inc., appellant.
Ralph L. Kaskell, Jr., of Deutsch, Kerrigan & Stiles, New Orleans, Frederick R. Bott, New Orleans, of counsel, for Continental Casualty Co., third-party plaintiff and third-party defendant.
Normann & Normann, Frank S. Normann, Margot Mazeau, New Orleans, for Union Asbestos and Rubber Co. and Zurich Ins. Co., defendants-appellants-appellees.
Bienvenue & Culver, H. F. Foster, III, New Orleans, for Home Ins. Co. and Flintkote Co., plaintiffs-appellees.
Drury & Lozes, James H. Drury, New Orleans, for American Employers' Ins. Co., defendant-appellee.
Sessions, Fishman, Rosenson & Snellings, New Orleans, for Allied Equipment Sales, Inc., defendants-appellants, and third-party defendant-appellee.
Chaffe, McCall, Phillips, Burke, Toler & Hopkins, Gordon O. Ewin, New Orleans, and William E. Crawford, Baton Rouge, for George V. LeGardeur, Jr., appellant.
Milling, Sal, Saunders, Benson & Woodward, J. Henry Phillips, III, New Orleans, for Carl E. Woodward, Inc., Carl E. Woodward and Armand LeGardeur, defendants and third-party defendants-appellees.
Christovich & Kearney, A. R. Christovich, Sr., New Orleans, for Fidelity and Casualty Co. of New York, third-party defendant and appellee, and third-party plaintiff and reconvenor against Continental Casualty Co.
Gauche, Wegener & Oster, Robert J. Oster, New Orleans, for Frank S. Foster, Jr., appellee.
Before SAMUEL, CHASEZ and JANVIER, JJ.
SAMUEL, Judge.
This involved litigation arose out of the collapse of a section of steel storage racks in the A. J. Warehouse in the City of New Orleans on April 26, 1961. A large quantity of floor tiles, which had been stored on the collapsed racks, were destroyed in the accident and the falling racks and tiles also damaged other merchandise stored nearby.
Two suits were filed as a result of the accident. They were consolidated for the purposes of trial and in that posture are before us in this appeal.
The plaintiffs in the first suit, No. 1825 of our docket, are The Flintkote Company, the manufacturer and supplier of the floor tiles, and its insurer the Home Insurance Company. The defendants in this suit are A. J. Warehouse, Inc. (hereinafter referred to as "A.J."), the owner of the warehouse; American Employers' Insurance Company, an insurer of A. J.; Union Asbestos and Rubber Co., Sturdi-Bilt Material Handling Division (now known as Unarco Industries, Inc. and referred to herein as "Unarco"), the designer and manufacturer of the collapsed storage racks; Zurich Insurance Company, the insurer of Unarco; George V. LeGardeur, Jr., Armand LeGardeur, Carl E. Woodward and Carl E. Woodward, Inc., parties involved in the design and construction of the warehouse; and Allied Equipment & Sales, Inc., referred to herein as "Allied," the local distributor for Unarco.
*547 Flintkote and Home Insurance claimed the sum of $69,523.22, the amount allegedly lost by the destruction of the floor tiles. They invoked the doctrine of res ipsa loquitur on the ground that all of the facts and circumstances concerning the collapse of the racks were exclusively within the knowledge and control of the defendants. Alternatively plaintiffs alleged particular acts of negligence on the part of each of the defendants.
The defendant George V. LeGardeur, Jr., in turn made third party demands against Fidelity & Casualty Company of New York and Continental Casualty Company. He alleged these companies were his insurers under certain professional liability insurance policies and as such owed him coverage for any liability to which he might be exposed as a result of the suit.
In addition to making a third party claim against George V. LeGardeur, Jr. and Fidelity, Continental also brought in Frank S. Foster, an individual who later became LeGardeur's business associate, as a third party defendant.
Unarco, Zurich, Allied and George LeGardeur each made third-party claims against their original codefendants for any amount they might be condemned to pay.
The second suit, No. 1826 of our docket, which also forms a portion of this appeal, was an action by A.J. against Unarco, Zurich, Allied and George V. LeGardeur, Jr., for $139,272.09, allegedly the damages suffered by Flintkote, loss of storage area by A.J., and the value of other products in the warehouse which were also destroyed in the rack collapse.
Third party actions were initiated in this suit, similar to those in the first action. George LeGardeur brought in Continental & Fidelity as defendants and each of the defendants named other codefendants as third party defendants.
In this posture the entire matter came to trial. The trial judge found the doctrine of res ipsa loquitur applicable. Under this theory he held that certain defendants in the first suit, George V. LeGardeur, Jr., Carl E. Woodward, Carl E. Woodward, Inc., Armand LeGardeur, Allied, and American Employers' Insurance, had successfully carried their burden of proving they were not at fault in connection with the collapse of the storage racks and he dismissed the suit as to them. However, the trial judge found that Unarco and its insurer Zurich had failed to prove they were not negligent and, applying res ipsa loquitur, he rendered judgment against them. As to A.J., which had not contested its liability to Flintkote and Home Insurance, the trial judge found it to be guilty of particular acts of negligence which contributed to the collapse of the racks, and cast it in judgment with Unarco and Zurich for $69,523.22 the full amount of the claim. The Court rejected the third party demands of Unarco and Zurich. The extent of Zurich's liability was recognized as $50,000, the policy limits of its contract with Unarco.
As an element of this judgment the trial judge recognized Continental Casualty Company as the insurer of George V. LeGardeur, Jr. and as such he held it owed LeGardeur a defense of this suit. Accordingly, Continental was cast for $7,000, the expenses the trial court found LeGardeur had incurred as a result of Continental's refusal or failure to defend on behalf of its insured.
All other third party demands by all parties were dismissed.
In the second action, No. 1826, the trial judge found A.J. had been contributorily negligent in the collapse of the storage racks and therefore barred from a recovery; its suit was dismissed in toto.
Again, as in the first suit, Continental was recognized as insurer of George V. LeGardeur, Jr., and was condemned to pay to him $7,000 as his attorney's fees for defending himself in this second suit.
*548 All other third party demands were dismissed.
Appeals have been taken by A.J. from both judgments; by Continental from both judgments; and by Unarco and Zurich from the judgment in the other consolidated suit. All successful parties in the two suits have answered these appeals. George V. LeGardeur, Jr. incorporated as part of his answer to both of Continental's appeals, a plea that his legal expenses be increased in each from $7,000 to $10,000, that he be awarded the 12% penalty as per R.S. 22:658, and that his expense for answering each appeal be set at $3,000 and be included as damages.
The entire matter is now before us for our consideration of the merits.
Certain facts appear from the record to be clear and uncontradicted and at this point, as did the trial judge in his reasons for judgment, we accept those facts as true. They are:
In the fall of 1959 A.J. entered into an agreement with Carl E. Woodward, Inc., whereby the latter contracted to design and partially construct a warehouse for A.J. At A.J.'s request the floor of the warehouse was to consist of a "floating slab" of concrete. A.J. itself was to do most of the construction work, other than the structural framework of the building, including the actual construction of the "floating slab" floor. Carl E. Woodward, Inc., engaged the services of George V. LeGardeur, Jr., for the design of the warehouse foundation and floor. During the trial much was made of LeGardeur's recommendation to use sloping pedestal foundations for the warehouse.
While the warehouse was under construction A.J. contracted with Flintkote to store Flintkote's tile in the warehouse when it was completed. A.J then contracted with Unarco to supply storage racks to accommodate the tile in the warehouse. A.J. made the arrangements for the acquisition of the racks through Allied, a local distributor of Unarco. Unarco undertook to design and build racks specifically to support the Flintkote tiles.
The racks when completed were delivered to A.J. and installed by A.J., through its own employees, under the direction of Allied. After the installation of the racks they were then loaded with the Flintkote tiles and were used for storage for a period of approximately eight months prior to their collapse. The basic question underlying this whole litigation then is: who was to blame for the collapse of the racks? To answer this question we must first decide an even more basic question: what actually caused the racks to collapse?
Each of the parties involved had their own version of what caused the racks to collapse. Actually, the question of ultimate liability by someone to Flintkote and its insurer is not denied by any party and A.J. admits its liability, but without admitting negligence on its part, to Flintkote and Home Insurance. Each defendant attempted to fix the blame on one or all of the other defendants.
In the first suit Flintkote and its insured alleged there were many different factors which, added together, caused the failure of the storage racks. First, they alleged A.J. was negligent in its method of assembling, stationing, and loading the racks. Further that A.J. was negligent in not periodically safety-checking the racks and in not noticing the racks had begun to lean. Also they alleged that A.J. was negligent in constructing and laying the floor of the warehouse. Next, Flintkote and Home Insurance alleged that George V. LeGardeur, Jr. was at fault in the design of the floor and foundations and in particular in designing a free floating slab floor to be constructed on sloping pedestals. Plaintiffs contended that this type of flooring on this foundation was naturally conclusive to irregular floor settlement and should not have been used for warehouse purposes. They contended the floor did in fact settle irregularly which they claim was a definite *549 factor in the rack collapse. By amended petition plaintiffs alleged the negligence of Carl E. Woodward, Inc., Carl E. Woodward and Armand LeGardeur, an officer of Carl E. Woodward, Inc., in the construction and design of the framework of the building.
In addition plaintiffs alleged the negligence of Allied in failing to transmit the essential information to Unarco to have them properly build the racks and in improperly supervising the installation of the racks. Then plaintiffs alleged the negligence of Unarco in the design and construction of the racks, in particular in failing to properly brace and support them and in failing to properly weld together certain pieces of the racks.
The defendants simply reiterated plaintiffs' claims in their various third party actions against each other, while each denied its own negligence.
The trial judge did not specifically decide the question of what caused the racks to fail. He stated in his reasons for judgment that there was no direct evidence as to what caused the collapse. However, we find the record is replete with instances where this type of evidence was presented. And it was upon such evidence that he made many important factual determinations. Thus we believe he was in error in applying the doctrine of res ipsa loquitur.
In Day v. National United States Radiator Corporation, 241 La. 288, 300-301, 128 So.2d 660, 665, the Supreme Court in deciding this point referred to several authorities with approval, as follows:
"The following is found in 38 Am.Jur. 999, sec. 303, Negligence:
`The doctrine of res ipsa loquitur has no application where all the facts and circumstances appear in evidence. Nothing is then left to inference and the necessity for the doctrine does not exist. Being a rule of necessity, it must be invoked only where evidence is absent and not readily available. It is not to be invoked when the evidence is available, and certainly not when it is actually presented. Nor has it any application where the cause of the accident is known and is not in question.'
"On this point, see also Res Ipsa LoquiturAvailability, 33 A.L.R.2d 791, 793; Prosser, Handbook on the Law of Torts, p. 214 (1955).
"In Southwestern Gas & Electric Co. v. Deshazo, 199 Ark. 1078, 138 S.W.2d 397, the Supreme Court of Arkansas refused to use the doctrine of res ipsa loquitur in deciding the case before it and said in explanation that it was committed to the theory that the doctrine cannot be availed of where there is direct evidence as to the precise cause of the accident and all the facts and circumstances attendant upon the occurrence clearly appear. In such a case, the court stated, nothing is left to inference and no presumption can be indulged."
We need only refer to the reasons for judgment to conclude the trial judge was able to make factual determinations concerning the accident which render the doctrine of res ipsa loquitur inapplicable in this case:
"The Court finds as a fact that there was a differential settlement of the floor of the A. J. Warehouse of 1 9/16ths inches at its greatest point.
"The Court finds as a fact that the welding of the racks was defective in many places and that in one place a weld was completely missing between a horizontal brace and an upright column; that there were holes in the weld metal and that there was lack of fusion in some of the welds, and from the testimony of all the experts in the case the Court has reached the following conclusions: That the welding of the racks was defective and insufficient; that the racks were flexible; that the racks were not stable; that there was settlement of the floor and that the settlement contributed to the *550 failure of the racks but that the settlement alone was not sufficient to cause the failure of the racks."
It was at this point that the Court went on to dismiss the suit as to all party defendants except A.J. and Unarco and its insurer Zurich.
We come to the same conclusion, not through the application of res ipsa loquitur, but rather from the same evidence the trial judge used in reaching his factual determinations.
First, as to A.J., there is no dispute concerning its liability in the matter. LSA-R.S. 54:21, which controls this situation, provides:
"A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary for any loss or injury to the goods which could not have been avoided by the exercise of such care."
The record clearly shows that the racks had actually begun to lean perceptibly weeks before the accident. This situation was of course known by A.J. but apparently ignored. A.J. was also aware that, as time passed, the warehouse floor would settle to a certain extent in a dish-shaped pattern, i. e., a greater amount of settlement in and around the center. Not to compensate for this settlement and the resulting lean of the racks is clearly failing to exercise the care that a reasonably careful owner would exercise in maintaining his goods. The record substantiates a finding that A.J.'s failure to meet the duty incumbent upon it was a contributing factor of the rack collapse. We thus hold that A.J. is answerable in damages for the loss suffered by the plaintiffs.
American Employers', which was made a party defendant as an insurer of A.J., has simply pleaded the provisions of its policy of insurance with A.J., as a defense. The trial judge found that an examination of this policy clearly shows that the loss suffered in this case is specifically excluded by the policy. We concur in this conclusion. Exclusion Clause "J" of the policy excludes:
"* * * property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control. * * *"
It is quite evident that the products destroyed in the accident were covered by this clause. The demand against American Employers' was thus correctly dismissed.
As to the question of negligence on the part of Unarco and Zurich, seven individuals testified for the various parties regarding the condition of the racks before and after the collapse. Their testimony supports the finding of the trial judge that the welding of the racks was defective and insufficient, and that the racks were designed to be too flexible for the purpose for which they were intended. Unarco was fully aware of the use to which the racks would be put and undertook to construct them specifically to accommodate the Flintkote tiles. Under these circumstances, we find that the defects in the racks as constructed were a contributing cause of their collapse; hence, we must hold Unarco liable with A.J. for the damages suffered by plaintiffs. Zurich has pleaded the $50,000 limit of liability in its contract of insurance with Unarco. We recognize this limit of liability, hence we will cast it in damages only to the $50,000 limit.
We now come to the question of the liability on the part of George V. LeGardeur, Jr., Carl E. Woodward, Inc., Carl E. Woodward and Armand LeGardeur. As to these parties, their liability, if any, revolves around the "floating slab" floor and its sloping pedestal foundation. It is plaintiff's contention that the floor design submitted by defendant George V. LeGardeur, *551 Jr. should not have included sloping pedestal foundations; that these foundations under the outer edge of the floor caused the floor to settle irregularly. They contend this irregular settlement was so pronounced as to cause the racks in the warehouse to lean and eventually was a factor in their collapse.
There is a great deal of conflicting expert testimony regarding this floor design. The trial judge recognized the conflicting nature of the testimony but simply stated that these defendants had carried their burden of absolving themselves of negligence under the res ipsa theory, and dismissed the suit as to them.
There are certain facts which we do recognize as established in the records. First, there was some differential settlement in the floor, that is, the floor's elevation was higher on the edges than it was in the center. We do not find this was excessive or that it necessarily was caused by the sloping pedestal foundations. The testimony supports the conclusion that this type of settlement is expected in a floor of this nature. Further, this flooring is used in other warehouses in the general area. The trial court found as a fact as seen above that the differential settlement of the floor was 1 9/16 inches at its greatest point. Thus while we find that this condition did indeed cause the racks to lean to a certain extent, this floor-caused-lean was not excessive, and was not a significant factor in the rack collapse. Therefore, we concur in the decision of the trial judge dismissing defendants George V. LeGardeur, Jr., Carl E. Woodward, Inc., Carl E. Woodward and Armand LeGardeur.
This brings us to a consideration of the alleged liability of Allied Equipment and Sales, Inc. As to that defendant the trial court concluded:
"The Court further finds that the Allied Equipment & Sales, Inc. was simply a commission salesman who got some information from A. J. Warehouse and transmitted it to Union Asbestos & Rubber Company; that the said Allied Equipment & Sales, Inc. and its president, Mr. James Williams, are not in any manner responsible for the happening which took place in the warehouse on April 26, 1961, and the Court will render judgment in their favor dismissing the said suit and all third party claims against them in these proceedings."
We are convinced that the trial court was correct in these conclusions. There is no evidence in the record that Allied, through its president, Mr. Williams, acted in any other capacity than as a local broker-distributor for Unarco. He simply got the parties together, relaying the information concerning A.J.'s needs to Unarco. We know of no possible basis under these circumstances for a determination of liability on Allied's part, and thus affirm the trial court's decision to dismiss the suit as to it.
We now turn to the third party demands of George V. LeGardeur against Fidelity and Casualty Company of New York and Continental Casualty Company. As to this matter certain facts are undisputed. Fidelity issued its policy of insurance to George V. LeGardeur, Jr., effective May 4, 1960. The life of the policy was for three years. By its terms Fidelity agreed to defend any suit brought against LeGardeur which alleged any act of negligence, error, or omission on his part involving him in his professional capacity. The contract contained a clause stating that the insured must notify the company of the act of negligence, error or omission during the term of the policy for the company to incur responsibility for it.
Shortly after this policy was issued, Fidelity decided to get out of the professional liability insurance field and advised all of its brokers and agents nationally to attempt to switch the policies to other companies. Pursuant to this request, Mr. *552 J. Everett Eaves, a local broker, attempted to place LeGardeur's policy with another firm. Finally on April 1, 1962, Continental agreed to issue its policy to LeGardeur and Frank S. Foster, Jr., his new associate, to take the place of the Fidelity policy.
It must be remembered that the accident which initiated this litigation took place on April 26, 1961, while the Fidelity policy was in effect. However, it is also undisputed that LeGardeur failed to notify Fidelity of any act of negligence, which might subject it to a claim, while the policy was in effect. Further, when LeGardeur contracted with Continental, he did not notify Continental of the A.J. matter.
When both Fidelity and Continental refused to defend LeGardeur from the suits by Home Insurance and A.J., LeGardeur impleaded both companies as third party defendants. The trial judge decided that Continental was the company which owed LeGardeur protection and cast that defendant for attorney's fees in both suits in the amount of $7,000 in each suit.
To properly understand what prompted the trial judge's decision we must realize the peculiar nature of these professional liability insurance contracts. One of their main advantages to an insured is that they are retroactive in nature. Thus an insured is buying protection for any act, which might subject him to litigation, which he committed prior to the policy date as well as those acts committed during the policy term. The condition here is of course that the insured must not have had knowledge of such prior error, omission or act at the effective date of the policy. In this case we find that LeGardeur cannot succeed against Fidelity because he failed to notify Fidelity, during the term of that insurer's policy with him, of the act which would expose him to liability. The reason for this failure to notify Fidelity can only be that LeGardeur simply was unaware that the rack collapse was attributable to some error or fault on his part. In any event he failed to notify Fidelity and therefore Fidelity had no contractual liability to him.
On the other hand, it is Continental's contention that LeGardeur did have knowledge of a prior error, omission or act that could be a basis for a claim against him, on the date of the issuance of the Continental policy. It is of course acknowledged by both parties that LeGardeur knew of the rack collapse in the A. J. Warehouse which had occurred long before the Continental policy date. Continental further contends that Frank S. Foster, Jr., LeGardeur's partner and co-insured under the Continental policy had previously made an investigation into this collapse and had concluded that the settling floor contributed to the accident. Continental contends that even if LeGardeur himself was unaware that his floor design would be cited as faulty and as a cause of the accident, Foster did know that fact and his knowledge was imputable to LeGardeur. Thus Continental further contends it was not bound to defend LeGardeur in a suit involving the A.J. rack collapse because of LeGardeur's alleged fraudulent failure to inform it of the possible claim against him.
We cannot agree with this contention. First, we do not accept Continental's theory that Foster's knowledge is imputable to LeGardeur. Second, even if we are prepared to do so, we hold that while Foster might have concluded the floor settlement contributed in some way to the rack collapse, we do not find he was of the opinion any act of negligence, omission or commission on LeGardeur's part was involved. In other words, he knew LeGardeur designed the floor, but he did not at any time believe that there was anything wrong with that design. The floor was expected to settle both by LeGardeur, the designer, and by A.J., the owner. Thus there was no reason for Foster or LeGardeur to believe the floor design would make LeGardeur subject to a claim for damages.
We hold that Continental, as LeGardeur's professional liability insurer, was obligated *553 to defend the suits on his behalf. Its failure to provide this protection made it answerable to LeGardeur for the expenses he incurred in defending the suits.
The Court awarded LeGardeur $7,000 in both suits as reasonable attorney's fees. LeGardeur now asks for an increase in this amount to $10,000 in each suit plus an additional $3,000 in each suit to cover expenses of appeal. We are of the opinion the two awards of $7,000 each are adequate to cover LeGardeur's legal expenses both in the trial court and in this court.
We are also of the opinion that LeGardeur's claim against Continental for a 12% penalty is without merit. The claim is based on LSA-R.S. 22:658 which, in pertinent part, provides:
"All insurers * * * shall pay the amount of any claim due any insured * * * within sixty days after receipt of satisfactory proofs of loss from the insured, * * * Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, * * * together with all reasonable attorney's fees for the prosecution and collection of such loss, * *."
A consideration of whether or not Continental's refusal was arbitrary, capricious or without probable cause is unnecessary. For we conclude the statute is inapplicable here. Because it is a penal statute, it is not favored, must be strictly construed and should not be extended by analogy. Harmon v. Lumberman's Mutual Casualty Company, 247 La. 263, 170 So. 2d 646; Nichols v. Iowa Mutual Insurance Company, 232 La. 856, 95 So.2d 338; Wright v. National Surety Corp., 221 La. 486, 59 So.2d 695.
By its plain wording the statute contemplates, and it must be restricted to, a claim for a specific money loss under a policy coverage. In the instant case the claim is solely for services, the defense of the suits on behalf of the insured, and no proof of loss was or could be made as envisioned by the statute.
We now turn to Continental's third party demands against Frank S. Foster, Jr. and Fidelity. It is Continental's contention that Foster should be answerable to it in damages for any amount it is condemned to pay plaintiffs because of special knowledge which Foster withheld from it when the Continental policy was issued to LeGardeur and Foster. We have discussed this idea of knowledge by Foster relative to an act of negligence, error or omission by LeGardeur and find no need to repeat that discussion here. It suffices to say that there is no basis for this third party demand against Foster.
As to Continental's third party demand against Fidelity, it admits that its demand is predicated on a finding that both it and Fidelity had policies which covered the accident in question. Continental urges that in this situation it should be considered an excess insurer, and that Fidelity be condemned to pay up to the limits of its policy. As we have previously determined that Fidelity owed no coverage to LeGardeur relative to this accident we must dismiss this third party demand also.
This brings us to the final question for our determination, the dismissal of the second of the two consolidated suits, wherein A.J. was the plaintiff, on a finding of A.J.'s contributory negligence. As to this the trial judge simply stated in his reasons for judgment:
"In view of the findings of fact and conclusions of law as heretofore set forth, it is the opinion of the Court that, in the matter entitled `A. J. Warehouse, Inc. et al vs. Union Asbestos & Rubber Company et al.' that the said A. J. Warehouse, Inc. is guilty of contributory negligence, and, under the Law of Louisiana, the said A. J. Warehouse, Inc. cannot recover. *554 There will therefore be judgment in that case in favor of all defendants and against all plaintiffs, save and except the third party claim of George V. Legardeur, Jr. against the Continental Casualty Company, which said claim will be hereinafter discussed."
On the basis of the conclusion we have reached in our prior discussion of A.J.'s negligence in the first suit, we agree with the above finding by the trial judge.
For the reasons assigned, the judgments appealed from are affirmed.
Affirmed.